**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-20521-CIV-BLOOM/OTAZO-REYES**

BEVERLEY B. SCHOTTENSTEIN,
Individually and as Co-Trustee Under the
Beverley B. Schottenstein Revocable
Trust U/A/D April 5, 2011, as Amended,

      Petitioner,

v.

J.P. MORGAN SECURITIES, LLC;
EVAN A. SCHOTTENSTEIN; and
AVI E. SCHOTTENSTEIN,

      Respondents.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon Respondents Evan A. Schottenstein and Avi E. Schottenstein's ("Respondents" or "the Schottensteins") Motion to Enforce Settlement (hereafter, "Motion to Enforce") [D.E. 20]. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 by the Honorable Beth Bloom, United States District Judge [D.E. 31]. The undersigned held an evidentiary hearing on this matter on October 5, 2021 (hereafter, "Evidentiary Hearing"). See Paperless Minute Entry [D.E. 46]; Transcript of October 5, 2021 Evidentiary Hearing (hereafter, "Transcript") [D.E. 49]. On November 5, 2021, Petitioner and Respondents filed their respective Post-Hearing Briefs. See Petitioner's Post-Hearing Brief [D.E. 53]; Respondents' Post-Hearing Brief [D.E. 52]. Having considered the testimonial and documentary evidence presented at the Evidentiary Hearing and having conducted a thorough review of the parties' written submissions and the relevant legal authorities, the undersigned respectfully recommends that the Schottensteins' Motion to Enforce be DENIED.

## PROCEDURAL BACKGROUND

On February 5, 2021, Petitioner Beverley B. Schottenstein ("Petitioner" or "Mrs. Schottenstein") filed her Petition for Entry of a Final Judgment Confirming Arbitration Award and Awarding Damages and Other Relief (hereafter, "Petition") [D.E. 1]. Petitioner sought to confirm the decision of a Financial Industry Regulatory Authority ("FINRA") arbitration panel that awarded her damages on her claims for constructive fraud, common law fraud, and elder abuse (hereafter, "Award"). Id. at 1–2.

Pursuant to the Award: Respondent J.P. Morgan Securities, LLC ("JPMS") was ordered to pay to Mrs. Schottenstein $4,708,550 in compensatory damages plus interest, $4,291,450 in additional damages plus interest, $172,630.50 in costs, and one half of Mrs. Schottenstein's attorney's fees; Respondent Evan A. Schottenstein was ordered to pay to Mrs. Schottenstein $9,000,000 in compensatory damages plus interest, $172,630.50 in costs, and one half of Mrs. Schottenstein's attorney's fees; and Respondent Avi E. Schottenstein was ordered to pay to Mrs. Schottenstein $602,251 in compensatory damages plus interest. Id. at 2.[1]

On March 8, 2021, Respondents filed a Motion to Vacate the Arbitration Award and Opposition to the Petition (hereafter, "Motion to Vacate") [D.E. 6]. On March 18, 2021, Petitioner and Respondents filed a Stipulated Motion for Extension of Briefing Deadlines (hereafter, "Stipulated Motion") [D.E. 14]. Therein, Petitioner and Respondents informed the Court that they had reached an "oral agreement concerning the amount of a settlement sum to be paid by [R]espondents to [P]etitioner to resolve [the Petition and Motion to Vacate]." Id. at 1. The Stipulated Motion stated that a "written settlement agreement [would] be prepared, revised, agreed upon, and executed by March 24, 2021," prescribing a "payment deadline . . . of seven days from

---

[1] "JPMS has paid all of its financial obligations under the Award." See Petitioner's Motion to Reopen the Case [D.E. 16 at 2].

the date of the settlement agreement." <u>Id.</u>  The Stipulated Motion further stated that, if "[R]espondents fail[ed] to timely make the settlement payment, the settlement agreement [would] be null and void and [Petitioner and Respondents would] return to their present postures and positions in [the] action." <u>Id.</u> at 1–2.  However, if Respondents timely made the settlement payment, Petitioner and Respondents would "stipulate to the voluntary dismissal of [the] proceeding." <u>Id.</u> at 2.

On March 19, 2021, the Court administratively closed the case without prejudice, pending the filing of a settlement agreement for the Court's "consideration and/or appropriate dismissal documentation." <u>See</u> Order Administratively Closing the Case [D.E. 15 at 1].  The Court further stated that, should Petitioner and Respondents "fail to finalize a written settlement agreement and comply with the agreed payment schedule, they [may] move to reopen the case and proceed with the claims asserted in [the] action." <u>Id.</u>

On June 8, 2021, Petitioner filed her Motion to Reopen the Case, stating that "[a]fter extensive negotiations, [Petitioner and Respondents had] been unable to reach agreement on the provisions and content of a written settlement agreement, and no written settlement agreement [had] been finalized." <u>See</u> Motion to Reopen the Case [D.E. 16 at 3].

On June 29, 2021, Respondents filed the Motion to Enforce, arguing that Petitioner and Respondents had settled the case on two occasions—first on March 18, 2021, and then again on May 6, 2021—and requesting that the Court enforce the purported settlement.  <u>See</u> Motion to Enforce [D.E. 20 at 1].  In support of the Motion to Enforce, Respondents filed a declaration from their counsel, Peter S. Fruin (hereafter, "Fruin Declaration") [D.E. 21].

On July 16, 2021, Petitioner filed her Opposition to Respondents' Motion to Enforce (hereafter, "Opposition"), arguing that Petitioner and Respondents had not reached a settlement

agreement on either of the two dates proffered by Respondents.  See Opposition [D.E. 25 at 13].

In support of her contention, Petitioner filed the following declarations of her attorneys:

Declaration of Guy M. Burns (hereafter, "Burns Declaration") [D.E. 27]; Declaration of Patrick J.

Lannon (hereafter, "Lannon Declaration") [D.E. 28]; and Declaration of Scott C. Ilgenfritz

(hereafter, "Ilgenfritz Declaration") [D.E. 30].  On July 28, 2021, Respondents filed their Reply in

Support of the Motion to Enforce (hereafter, "Reply") [D.E. 38].

## APPLICABLE LAW

"In determining whether a binding agreement arose between the parties, courts apply the

contract law of the particular state that governs the formation of contracts." D.B.C. Corp. v. Nucita

Venezolana, C.A., No. 18-25225-CIV-MORENO, 2020 WL 8872096, at *1 (S.D. Fla. June 15,

2020) (internal citation and alteration omitted); see also Roland Corp. v. inMusic Brands, Inc., No.

17-CV-22405-MORENO/LOUIS, 2020 WL 10818391, at *3 (S.D. Fla. Sept. 28, 2020) (same);

Ahrens Enters., Inc. v. Winning, No. 18-80650-Civ-Brannon, 2018 WL 6519106, at *2 (S.D. Fla.

Nov. 19, 2018) (same).  In this case, it is undisputed that Florida law applies.  See Motion to

Enforce [D.E. 20 at 5–7]; Opposition [D.E. 25 at 7–8].

Florida law requires that the party alleging the existence of an agreement show the presence

of an offer, acceptance, consideration, and specificity of terms.  See Eurocon, LLC v. Empire

Indem. Ins. Co., No. 1:19-cv-24351-KING/JB, 2020 WL 6385025, at *2 (S.D. Fla. Sept. 28, 2020),

report and recommendation adopted, 2020 WL 6381771 (S.D. Fla. Oct. 30, 2020).  Further,

"[a]pplying Florida law, the party seeking to enforce a settlement agreement bears the burden of

proving, by a preponderance of the evidence, that the opposing party assented to the terms of the

agreement." D.B.C. Corp., 2020 WL 8872096, at *1.  "[A]n objective test is used to determine if

the parties formed a valid contract—whether a reasonable person would have believed that the

4

parties intended to form a contract when the offer was made." <u>Eurocon</u>, 2020 WL 6385025, at *2. "To compel enforcement of a settlement agreement, its terms must be sufficiently specific and mutually agreed upon as to every essential element." <u>Perez-Perez v. Vasquez</u>, No. 16-CIV-14002-MARTINEZ/MAYNARD, 2019 WL 5291097, at *2 (S.D. Fla. June 13, 2019) (internal quotation omitted), <u>report and recommendation adopted</u>, 2019 WL 5290909 (S.D. Fla. July 12, 2019). "An agreement is not considered final where the record establishes that it is the intent of the parties that further action be taken prior to the completion of a binding agreement." <u>Id.</u> (internal quotation omitted).

Further, under Florida law, "[a] party seeking to compel enforcement of a settlement bears the burden of proving that an attorney has the clear and unequivocal authority to settle on the client's behalf." <u>B.T. by and through Tompson v. Target Corp.</u>, No. 17-60871-TORRES, 2017 WL 4868788, at *2 (S.D. Fla. Oct. 27, 2017) (alteration in original) (quoting <u>Sharick v. Se. Univ. of Health Scis., Inc.</u>, 891 So. 2d 562, 565 (Fla. 3d DCA 2004)). "An attorney's mere employment does not meet this burden nor does an attorney's belief that he or she possesses such authority." <u>B.T. by and through Tompson</u>, 2017 WL 4868788, at *2. "Instead, Florida law requires that an attorney . . . have clear and unequivocal authority to agree to a binding offer or agreement on a client's behalf." <u>Id.</u>

## **FINDINGS OF FACT**

The following witnesses testified at the Evidentiary Hearing: Peter S. Fruin ("Mr. Fruin"); Scott C. Ilgenfritz ("Mr. Ilgenfritz"); Guy M. Burns ("Mr. Burns"); and Patrick J. Lannon ("Mr. Lannon"). <u>See</u> Paperless Minute Entry [D.E. 46]; Transcript [D.E. 49 at 2]. The following documents were admitted at the Evidentiary Hearing: Petitioner's Exhibits 1–25; Respondents' Exhibits 1–33. <u>Id.</u>; Joint Exhibit List [D.E. 45].

### I.      Mr. Fruin

1.      Mr. Fruin represented the Schottensteins in the underlying arbitration brought by Mrs. Schottenstein.  Shortly after the FINRA panel issued the Award, see Resp'ts' Ex. 1, Mr. Fruin and Mr. Ilgenfritz began to discuss settlement.  Specifically, Mr. Fruin and Mr. Ilgenfritz discussed the amount of the settlement and the consequences of not reaching a settlement.

2.      Mr. Ilgenfritz indicated to Mr. Fruin that an important concern of his and Mrs. Schottenstein was ensuring the collectability of the settlement payment.  On March 11, 2021, Mr. Ilgenfritz stated that the Schottensteins could accept a counterproposal from Mrs. Schottenstein only be executing and delivering a mutually agreeable settlement agreement and paying the settlement amount by the deadline set forth in the agreement.  See Resp'ts' Ex. 5.

3.      Mr. Fruin conceptually understood that if the Schottensteins did not pay, Mrs. Schottenstein should have the right to pursue all avenues available to her to collect the money.  Id. However, according to Mr. Fruin, this was not a material term of the parties' agreement to settle.

4.      Mr. Fruin indicated to Mr. Ilgenfritz that any settlement would have to contain confidentiality and non-disparagement provisions, as well.

5.      Mr. Fruin testified that the parties reached an oral settlement on or about March 18, 2021, which identified certain key terms of their agreement.  Mr. Fruin and Mr. Ilgenfritz orally agreed that: the Schottensteins would make a $4 million payment to Mrs. Schottenstein; Mrs. Schottenstein would release the Schottensteins; the settlement would be confidential; and if the Schottensteins failed to pay the settlement amount within seven days, the settlement would be null and void, and Mrs. Schottenstein would be entitled to pursue the full amount owed to her.

6.      Mr. Ilgenfritz told Mr. Fruin that he did not expect that Mrs. Schottenstein would agree to a non-disparagement provision.  Nonetheless, Mr. Fruin indicated that he would try to

draft a "palatable" non-disparagement provision for Mrs. Schottenstein's consideration.  See Tr. [D.E. 49 at 14:20].

7.     Mr. Fruin and Mr. Ilgenfritz discussed that Mr. Fruin would put together the first draft of a settlement agreement.  Mr. Ilgenfritz then drafted the Stipulated Motion [D.E. 14] requesting an extension of the briefing deadlines associated with the Petition [D.E. 1] and informing the Court that the parties had "reached a settlement."  Tr. [D.E. 49 at 15:12–13].  Mr. Fruin agreed to the Stipulated Motion, and Mr. Ilgenfritz filed it on March 18th.  See Resp'ts' Ex. 6.

8.     On March 19, 2021, Mr. Fruin's partner, Jon Brennan ("Mr. Brennan"), sent a draft settlement agreement to Mr. Ilgenfritz.  See Resp'ts' Ex. 8.  This draft contained, in part: the payment term of $4 million; a general release of the Schottensteins by Mrs. Schottenstein; a confidentiality provision; and a provision that if the Schottensteins failed to make payment within seven days, the settlement between the parties would be null and void.  Id.

9.     On March 24, 2021, Mr. Ilgenfritz sent back a redlined copy of the draft settlement agreement and a cover letter explaining the key major changes that he and Mrs. Schottenstein had made to the draft.  See Resp'ts' Ex. 11.  Mr. Ilgenfritz: modified the release provision to reflect releases by both sides and the confidentiality provision to reflect mutual confidentiality obligations; and struck the non-disparagement clause.  Id.  The redlined version of the agreement retained the payment term of $4 million and the provision that if the Schottensteins failed to make payment within seven days, the settlement between the parties would be null and void.  Id.  Mr. Fruin knew that Mrs. Schottenstein had numerous people advising her, including tax counsel.

10.    On April 6, 2021, Mrs. Schottenstein's granddaughter, Cathy Schottenstein Pattap ("Ms. Pattap"), published a blogpost about the arbitration and the parties' ongoing settlement

discussions.  See Resp'ts' Ex. 14.  Mr. Fruin believed that the blogpost violated the parties' confidentiality agreement.  On or about April 12, 2021, Mr. Ilgenfritz informed Mr. Fruin that confidentiality could no longer be a term of the settlement.

11.     On April 27, 2021, Mr. Fruin emailed Mr. Ilgenfritz asking him if he had time to speak.  See Resp'ts' Ex. 16.  Mr. Ilgenfritz was unavailable because he had just experienced a death in his family.  He directed Mr. Fruin to speak with his partner, Mr. Burns, instead.  Mr. Fruin told Mr. Burns that he believed that Mrs. Schottenstein had violated an otherwise valid settlement but that the Schottensteins were willing to negotiate anew.  See Resp'ts' Ex. 17.

12.     Mr. Fruin acknowledged that the release language had been a "sticking point" between the parties.  Tr. [D.E. 49 at 26:6].  He and Mr. Burns discussed the scope of the mutual general release provision.  According to Mr. Fruin, Mr. Burns insisted that the release encompass only existing claims, not future claims.  As a result, on April 29, 2021, Mr. Fruin and Mr. Brennan sent a revised draft settlement agreement to Mr. Burns that included a mutual release through the time of settlement and did not "impinge upon any claims that might accrue in the future."  See Resp'ts' Ex. 19; see also Tr. [D.E. 49 at 27:19–20].

13.     On April 30, 2021, Mr. Burns told Mr. Fruin that Mrs. Schottenstein's tax counsel, Mr. Lannon, was insisting on the inclusion of an additional sentence relating to the characterization of the settlement payment for tax purposes.  See Resp'ts' Ex. 20.  Mr. Burns also indicated that he had a few additional edits that he wanted to run by his team before sending back a revised settlement agreement.  Id.  According to Mr. Fruin, the additional sentence was part of Mr. Burns' otherwise "innocuous, noncritical" edits.  Tr. [D.E. 49 at 29:20].

14.     Later that same day, Mr. Burns sent Mr. Fruin a revised settlement agreement that contained: the payment term of $4 million; the mutual release term; the provision that if the

Schottensteins failed to pay within seven days, the settlement would be voidable; and the tax-related provision that counsel had discussed earlier in the day.  See Resp'ts' Ex. 21.  The draft also struck the word "Confidential" from the header, as confidentiality was no longer a term of the settlement, and corrected a punctuation error.  Id.  Lastly, Mr. Burns modified language about the satisfaction of the Award and release of claims and deleted a different sentence about the characterization of the settlement.  Id.

15.    Mr. Fruin testified that, apart from later "tweak[ing]" the tax-related term, he did not object to its inclusion.  Tr. [D.E. 49 at 32:12].

16.    While Mr. Fruin was on vacation, Mr. Brennan emailed Mr. Burns and Mr. Ilgenfritz with a draft settlement agreement that accepted Mr. Burns' edits and made two additional, "very minor" edits.  See Resp'ts' Ex. 22; see also Tr. [D.E. 49 at 33:21].  Mr. Fruin described these changes as the "deletion of one word and the inclusion of two."  Tr. [D.E. 49 at 34:1].  Specifically, Respondents' counsel deleted one more instance where they had caught the word "Confidential" in a header and added the words "in part" to the tax-related provision.  Mr. Fruin testified that he did not think the addition of "in part" was "material or significant at all." Id. at 35:3–4.  Mr. Fruin also stated that this iteration of the settlement agreement contained an integration clause that Petitioner's counsel had proposed at the start of negotiations.  Id. at 76:3–77:5.

17.    According to Mr. Fruin, the Schottensteins' chance to file a renewed motion to vacate the Award expired the first week of May.  After that deadline, on May 10, 2021, Mr. Ilgenfritz emailed to Mr. Fruin a redlined draft settlement agreement in which he removed the "in part" language and modified the release provision to one that encompassed future claims.  See Resp'ts' Ex. 23; Tr. [D.E. 49 at 36:6–10].  Mr. Fruin emphasized that this was something Mr.

Burns had "insisted could not be done." Tr. [D.E. 49 at 36:11–12]. Mr. Fruin testified that he did not know why Mr. Ilgenfritz insisted on this change to the release term.

18.     Mr. Fruin testified that when he called Mr. Ilgenfritz to discuss the change, Mr. Ilgenfritz indicated that he had "no authority at [that] point to do anything differently." Id. at 39:23–24.

19.     In June 2021, Mr. Ilgenfritz called Mr. Fruin and told him that he had "talked to [his] client until [he was] blue in the face" but that his "hands [were] now tied." Id. at 40:2–7. He informed Mr. Fruin that Mrs. Schottenstein had withdrawn all settlement offers and would move to reopen the case and confirm the Award. See Resp'ts' Ex. 24.

20.     On June 21, 2021, after the Court granted Mrs. Schottenstein's Motion to Reopen the Case [D.E. 18], the parties filed a joint status report [D.E. 19] setting forth the issues that remained to be adjudicated. See Resp'ts' Ex. 25.

21.     Mr. Fruin testified that, at all times during his negotiations with Petitioner's counsel, he believed that Mr. Ilgenfritz and Mr. Burns had the authority to settle the case. He also testified that he believed that the parties reached a settlement both on March 18, 2021 and May 6, 2021.

22.     Specifically, Mr. Fruin stated that on March 18th: the parties reached an oral settlement; the parties notified the Court about the settlement; the key terms of the settlement were delineated and remained unchanged; and the parties' notification to the Court "did not insist upon any specific action to be taken." Tr. [D.E. 49 at 44:15–20].

23.     However, Mr. Fruin acknowledged that the Stipulated Motion indicated that the parties expected to "create and draft a written settlement agreement." Id. at 44:20–22. Mr. Fruin also acknowledged that the Stipulated Motion did not refer to general releases or confidentiality—

both terms that Mr. Fruin identified as "critical" or "important". Id. at 57:17, 23. Moreover, Mr. Fruin testified that, by March 18th, the parties had not assented to language for a general release, confidentiality, or payment structure. Id. at 58:21, 59:15, 60:11–13.

24. Mr. Fruin further testified that, by May 6, 2021, the parties had agreed to all material terms via email communications and memorialized those terms in a written agreement—including a mutual release term. According to Mr. Fruin, Respondents had "compromised" by agreeing to resolve the dispute without confidentiality, non-disparagement, and admission of liability clauses. Id. at 64:9–16. Thus, the only issue that remained in dispute in Mr. Fruin's view boiled down to two words: the inclusion of the term "in part" in the tax-related provision. Mr. Fruin testified that these words were "not material" and "not significant" and that he was not wedded to the edit, although he did admit that the language would have been helpful for his clients. Id. at 45:12–13, 74:12, 74:21.

25. Mr. Fruin further testified that, subsequently, Mrs. Schottenstein's counsel threw a "nuclear bomb out" in the form of the modified release provision. Id. at 45:18.

26. Mr. Fruin reiterated that the Schottensteins are ready, willing, and able to pay the $4 million to Mrs. Schottenstein but admitted that they have not yet made this payment.

27. The undersigned found Mr. Fruin's testimony to be credible, albeit colored by his belief that some of the settlement terms were not key terms and did not require the parties' mutual assent.

## II.     Mr. Ilgenfritz

28. Mr. Ilgenfritz represented Mrs. Schottenstein in the underlying arbitration.

29. Mr. Ilgenfritz recalled that, on February 23, 2021, Mr. Fruin made an oral offer to settle the parties' dispute. On March 11, 2021, following counsel's exchange of counteroffers,

Mr. Ilgenfritz emailed Mr. Fruin conditioning Respondents' acceptance of an offer to settle on the execution and delivery of a mutually acceptable settlement agreement and payment of the settlement amount. <u>See</u> Pet'r's Ex. 2. Mr. Ilgenfritz testified that Mr. Fruin responded by saying that he understood Mr. Ilgenfritz's position. <u>See</u> Pet'r's Ex. 3.

30. Mr. Ilgenfritz stated that, as of March 11th, he had not discussed the actual terms or conditions of any particular settlement provision with Mr. Fruin and that counsel's focus between February 23rd and March 18th was to reach an agreement on a settlement amount. Mr. Ilgenfritz testified that, during that time, he did not assent to any term on behalf of Mrs. Schottenstein, other than the $4 million payment amount.

31. Mr. Ilgenfritz confirmed that the Stipulated Motion [D.E. 14] did not say anything about material terms of the agreement, other than the settlement payment amount, and that it indicated that the parties intended to include a payment deadline in a forthcoming written settlement agreement. The Court administratively closed the case and, in doing so, allowed the parties "to file a settlement agreement with the [C]ourt for its consideration and/or appropriate dismissal documentation". <u>See</u> Pet'r's Ex. 7. However, according to Mr. Ilgenfritz, the parties failed to finalize a written settlement agreement.

32. After the filing of the Stipulated Motion, the parties continued to discuss the terms of a settlement agreement. On March 19, 2021, Mr. Brennan sent a first draft of the settlement agreement to Petitioner's counsel. In the following days, Mr. Ilgenfritz spoke with Mr. Lannon and Mrs. Schottenstein about the draft. On March 24, 2021, Mr. Ilgenfritz responded to Mr. Brennan with a redlined version of the draft and a letter explaining his changes. <u>See</u> Pet'r's Ex. 12.

33. In the letter, Mr. Ilgenfritz objected to: the one-sided, general release by Mrs.

Schottenstein in favor of the Schottensteins; the one-sided confidentiality provision; the one-sided non-disparagement provision; the no admission of liability provision; and the dismissal with prejudice provision.  Id.  Further, Mr. Ilgenfritz objected to the draft's omission of a provision detailing the consequences of Respondents' failure to make payment within seven days.  Id.  Mr. Ilgenfritz modified the draft accordingly.  Id.

34.     Pursuant to Mr. Lannon's request, Mr. Ilgenfritz added language concerning the allocation of the settlement payment proceeds.  Id.  This language was included to attempt to obtain a more favorable tax treatment for Mrs. Schottenstein.  Mr. Ilgenfritz testified that he had discussed this concept with Respondents' counsel prior to its appearance in the redlined draft, and that Mr. Fruin did not think that the Schottensteins would have a problem with it.

35.     Mr. Ilgenfritz explained that Respondents' counsel did not accept all of the terms in the draft agreement that he sent on March 24th.  Instead, on March 29th, Mr. Brennan responded to Mr. Ilgenfritz with another redlined settlement agreement.  See Pet'r's Ex. 13.  Mr. Brennan had: deleted the tax treatment provision; modified the release provision; reinserted the no admission of liability provision; modified the confidentiality provision; and reinserted the non-disparagement provision.  Id.  On April 9, 2021, Mr. Ilgenfritz rejected the March 29th draft.  See Pet'r's Ex. 14, 15.

36.     The parties did not exchange any further drafts between April 9th and April 27, 2021.  While Mr. Ilgenfritz was out of office between April 27th and May 10th, his partner, Mr. Burns, negotiated with Mr. Fruin and exchanged additional draft agreements with him.  Mr. Ilgenfritz testified that he believed Mr. Burns communicated primarily with Mr. Lannon during this time, and that Mr. Lannon, in turn, communicated with Mrs. Schottenstein.

37.     Upon  Mr.  Ilgenfritz's  return,  he  communicated  with  Mr.  Lannon  about

Respondents' most current draft of the settlement agreement.   Then, on May 10, 2021, Mr. Ilgenfritz emailed Mr. Fruin and Mr. Brennan with proposed revisions to the agreement based on his conversations with Mr. Lannon.   See Pet'r's Ex. 24.

38.     Mr. Ilgenfritz emphasized that the tax language was "incredibly important" to Mrs. Schottenstein and that, according to Mr. Lannon, the addition of "in part" rendered the provision "worthless."   Tr. [D.E. 49 at 97:7–15].   Mr. Ilgenfritz also communicated to Mr. Fruin that Mrs. Schottenstein "wanted this settlement to put an end to everything, and that included potential estate planning document challenges following her death."   Id. at 97:23–25.

39.     Mr. Fruin rejected these changes via a telephone conversation with Mr. Ilgenfritz on May 19, 2021.   In June 2021, Mr. Fruin contacted Mr. Ilgenfritz to try and revive settlement discussions.   However, Mrs. Schottenstein withdrew her offer to settle on June 8, 2021.

40.     Mr. Ilgenfritz did not recall whether Mr. Fruin ever communicated to him Respondents' willingness to remove the words "in part" from the tax-related provision.

41.     The undersigned found Mr. Ilgenfritz's testimony to be credible and unambiguous.

**III.   Mr. Burns**

42.     On April 27, 2021, Mr. Burns engaged in settlement communications with Mr. Fruin while Mr. Ilgenfritz was out of office.   See Pet'r's Ex. 18, 19.

43.     Mr. Burns preliminarily told Mr. Fruin that the release language needed to be "less attenuated and easier to understand" moving forward.   Tr. [D.E. 49 at 110:21–22].   Mr. Burns did not recall telling Mr. Fruin that the release provision needed to exclude future releases.   Id. at 110:23–111:6.   On April 29, 2021, Mr. Fruin sent Mr. Burns a revised draft of the settlement agreement.

44.     On April 30, 2021, Mr. Burns informed Mr. Fruin that Mr. Lannon was insisting

on the reinsertion of a sentence relating to the tax treatment of the settlement proceeds.  Mr. Burns

testified that, at this point, he was the primary contact for Mr. Fruin, but that he was taking his

instructions from Mr. Lannon.  Mr. Burns also testified that he had made it clear to Mr. Fruin that

"anything would have to pass Mr. Lannon's approval."  Id. at 112:3.

45.     Mr. Burns testified that, in a subsequent draft, Mr. Fruin inserted the words "in

part" in the tax-related provision.  Mr. Burns forwarded this proposed language to Mr. Lannon.  At

this point, Mr. Ilgenfritz reentered the negotiations, and Mr. Burns "turned the matter back over to

him."  Id. at 112:23.

46.     Mr. Burns never communicated to the Schottensteins' counsel that Mrs.

Schottenstein had unequivocally accepted a term contained in any of the draft agreements.  Mr.

Burns never communicated directly with Mrs. Schottenstein.  Mr. Burns testified that he would

have "deferred" to Mr. Lannon on any agreement with respect to the language of the settlement.

Id. at 116:2.

47.     The undersigned found Mr. Burns' testimony to be credible and unbiased.

**IV.     Mr. Lannon**

48.     Mr. Lannon practices in the area of wills, trusts, and estates.  He has represented

Mrs. Schottenstein for about three years.  In connection with this action, Mr. Lannon provides Mrs.

Schottenstein with tax advice related to any potential settlement with the Schottensteins.

49.     Mr. Lannon testified about the tax implications of a settlement with the

Schottensteins.  Mr. Lannon did not know how Respondents intended to pay the settlement amount

or to which claims the payment would pertain.  However, he explained that, if the parties chose to

settle the allegations that pertained to capital gains, Mrs. Schottenstein's maximum tax impact

would be 23.8%; otherwise, the settlement payment would be vulnerable to a 37% income tax rate,

which would significantly reduce her recovery after the tax deduction and payment of attorney's fees.  Id. at 123:4–24.

50.     Mr. Lannon acknowledged that it is difficult to predict how the Internal Revenue Service ("IRS") will respond to any particular tax position.  Nonetheless, Mr. Lannon opined that the inclusion of the tax-related provision would "enormously benefit and make very likely a more favorable position" for Mrs. Schottenstein before the IRS.  Id. at 126:24–25.

51.     Mr. Lannon testified that Mrs. Schottenstein insisted that language characterizing the settlement proceeds be part of the settlement agreement.  Additionally, he testified that Mrs. Schottenstein eventually insisted that the release language encompass future challenges to her estate.

52.     Mr. Lannon provided Mr. Burns with revisions but was not involved in authorizing Mr. Burns' exchange of draft settlement agreements with Mr. Fruin.

53.     Mr. Lannon confirmed that the addition of "in part" to the proposed tax language rendered the tax provision "useless."  Id. at 133:18.

54.     The undersigned found Mr. Lannon's testimony to be credible and knowledgeable regarding tax matters.

## DISCUSSION

### I.     The parties did not reach an enforceable, oral settlement agreement on March 18, 2021.

The Schottensteins contend that the parties reached an enforceable, oral settlement agreement on March 18, 2021.  According to the Schottensteins, shortly after the FINRA arbitration panel issued the Award, the parties "began discussing a global resolution of all issues surrounding [the Award], the [Petition], the Motion to Vacate, and all the claims raised in the underlying FINRA arbitration."  See Motion to Enforce [D.E. 20 at 1].  The Schottensteins further

contend that these negotiations culminated in an oral settlement agreement on March 18, 2021 with the following terms:

> (1) payment by Respondents to Petitioner of $4 million, (2) a general release by Petitioner, (3) confidentiality, (4) a memorialized settlement agreement to follow, and (5) an agreement that if Respondents failed to make payment within a seven day deadline in the written agreement, then the settlement between the parties would be null and void.

Id. at 2.  Petitioner argues that the oral agreement did not address any terms apart from the "compromise amount Respondents would pay to resolve their obligations to Mrs. Schottenstein." See Opposition [D.E. 25 at 2].  Petitioner further notes that, by email dated March 11, 2021, Mr. Ilgenfritz conditioned the Schottensteins' acceptance of any offer to settle from Mrs. Schottenstein on the "[execution] and [delivery] of a mutually acceptable settlement agreement and [] paying the agreed upon settlement amount by the deadline".  Id.; see also Pet'r's Ex. 3.

It is undisputed that, on or about March 18, 2021, the parties orally agreed that the Schottensteins would pay Mrs. Schottenstein $4 million to resolve their obligations to her.  See Motion to Enforce [D.E. 20 at 2]; Opposition [D.E. 25 at 2]; see also Tr. [D.E. 49 at 13:24, 83:1]. While this agreement was reflected in the parties' Stipulated Motion, that submission to the Court also indicated that a "written settlement agreement [would] be prepared, revised, agreed upon, and executed by March 24, 2021."  See Stipulated Motion [D.E. 14 at 1].

Although Mr. Fruin testified at the Evidentiary Hearing that, by March 18, 2021, the parties had orally discussed terms such as "a release by [Petitioner] towards [Respondents]", "confidentiality with regards to any type of settlement", a deadline for payment, consequences of untimely payment, and non-disparagement, the specifics of these terms had not yet been mutually agreed upon by that date.  Tr. [D.E. 49 at 14:1–15:21].  Moreover, Mr. Ilgenfritz testified that "while Mr. Fruin had mentioned confidentiality, non-disparagement, and possibly a general

17

release, there had been absolutely no discussion of those terms in any of [counsel's] conversations [leading up to the March 18, 2021 Stipulated Motion] other than [Mr. Fruin] mentioning that his clients would want those things".  Tr. [D.E. 49 at 85:13–19].

Based on the evidence, the undersigned concludes that, as of March 18, 2021, the parties had not yet agreed on all essential terms of settlement and had nothing more than an agreement to agree.  See, e.g., Roland Corp., 2020 WL 10818391, at *4 (concluding the same about a term sheet that was followed by protracted negotiations about several material terms); see also Eurocon, 2020 WL 6385025, at *2 (reiterating that an offer, acceptance, consideration, and specificity of terms are required to prove the existence of an agreement); Ahrens Enters., 2018 WL 6519106, at *2 ("A contract is formed when the parties express their mutual assent to the essential terms, a so-called 'meeting of the minds' on all essential terms and obligations of the contract.") (internal citations omitted).  Thus, Respondents have failed to carry their burden of proving, by a preponderance of the evidence, that Petitioner had assented to the terms of a settlement agreement.  D.B.C. Corp., 2020 WL 8872096, at *1 (finding that "the party seeking to enforce a settlement agreement bears the burden of proving, by a preponderance of the evidence, that the opposing party assented to the terms of the agreement").

Moreover, the Stipulated Motion indicated that the parties had agreed to resolve the case but had yet to execute a binding settlement agreement, which rendered the purported oral agreement inchoate.  Indeed, Counsel for Petitioner in his March 11th email correspondence to Respondents' counsel (see Pet'r's Ex. 2) and the Court in its order administratively closing the case [D.E. 15] acknowledged that the parties expected to execute an agreement to bind them to any settlement.  See Roland Corp., 2020 WL 10818391, at *3–4 (finding that a term sheet "memorialized a point at which the [p]arties had agreed to invest their energies in resolving the

18

case on the [principal] terms reached at mediation, but not a binding settlement agreement" and noting that, although at times, "it may be a mere formality for the parties to execute a final settlement agreement . . . a final agreement may, like here, be a condition precedent to a binding contract."); see also Miles v. Northwestern Mut. Life Ins. Co., 677 F. Supp. 2d 1312, 1316 (M.D. Fla. 2009) ("Where the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time."); Perez-Perez, 2019 WL 5291097, at *2 ("An agreement is not considered final where the record establishes that it is the intent of the parties that further action be taken prior to the completion of a binding agreement.") (internal quotation omitted).

Therefore, the undersigned concludes that Petitioner and Respondents did not enter into an enforceable, oral settlement agreement on March 18, 2021.[2]

**II.     The parties did not reach an enforceable settlement agreement on May 6, 2021.**

Respondents also contend that the parties' subsequent negotiations culminated in a second settlement agreement on May 6, 2021.  The evidence and counsel's testimony do not support this argument, as the parties had yet to execute a binding settlement agreement containing terms to which they mutually assented by that date.  See D.B.C. Corp., 2020 WL 8872096, at *1; Perez-Perez, 2019 WL 5291097, at *2.

The evidence establishes that, after March 18, 2021, the parties continued to negotiate a

---

[2] Respondents contend that Ms. Pattap's April 6, 2021 blogpost about the ongoing negotiations between Petitioner and Respondents breached confidentiality.  See Motion to Enforce [D.E. 20 at 3].  However, at this point, the parties had not yet mutually assented to a confidentiality term and had not yet executed a settlement agreement, so there was no confidentiality to breach.  See, e.g., Wisekal v. Lab'y Corp. of Am., No. 12-80806-CIV-HURLEY, 2016 WL 4154781, at *4 (S.D. Fla. Mar. 8, 2016) ("The record does not show mutual asse[n]t with regard to resolution of . . . the Plaintiff's agreement to be bound, individually, by a written confidentiality requirement; the Plaintiff's attorneys' agreement to be bound, in writing, by a confidentiality requirement; the binding nature of any settlement agreement prior to execution in written form[;] or the nature of releases to be exchanged.").

settlement agreement.  Specifically, beginning on March 19, 2021, counsel for Respondents, Mr. Brennan and Mr. Fruin, emailed a "current draft of the settlement agreement" to Mr. Ilgenfritz. See Resp'ts' Ex. 8.  On March 24, 2021, Mr. Ilgenfritz responded with a redlined version of the draft settlement agreement, commenting that the "original draft . . . was inappropriately one-sided."  See Pet'r's Ex. 12.  Mr. Ilgenfritz made several modifications to the terms proposed by Respondents' counsel and added additional terms, including a tax-related term.  Id.; Tr. [D.E. 49 at 87:23–90:21].  On March 29, 2021, Mr. Brennan wrote back to Mr. Ilgenfritz, stating that Respondents had "accepted the vast majority of [the] changes . . . but [had] made edits on issues [they deemed] to be important."  See Resp'ts' Ex. 12.  Respondents' edits included reinserting language from their original draft, modifying several terms, and deleting the tax-related term.  Id.; Tr. [D.E. 49 at 90:25–93:12].  On March 31, 2021, Mr. Ilgenfritz informed Mr. Brennan that the "revisions [were] unacceptable," further indicating that "unless [they could] get very close to the revisions [he had sent], [Petitioner would] be requesting the court to reopen the case and rule on the [Stipulated Motion]".  See Pet'r's Ex. 14; see also Tr. [D.E. 49 at 93:13–94:5].  In an email dated April 9, 2021, Mr. Ilgenfritz confirmed that Respondents' draft settlement agreement from March 29, 2021 was rejected.  See Pet'r's Ex. 15; see also Tr. [D.E. 49 at 94:6–17].

Counsel did not revisit the draft settlement agreement again until April 27, 2021, when Mr. Fruin and Mr. Burns connected over the phone to resume negotiations.  See Tr. [D.E. 49 at 110:1–111:8].  Mr. Fruin sent Mr. Burns a draft settlement agreement on April 29, 2021.  See Resp'ts' Ex. 19; Tr. [D.E. 49 at 111:15–112:11].  Mr. Burns responded on April 30, 2021 with a redlined draft of the agreement indicating that, in addition to other edits, the tax-related term had been reinserted pursuant to Mr. Lannon's tax advice.  See Pet'r's Ex. 22.

On May 6, 2021, Mr. Brennan replied to Mr. Burns with his own redlined draft, indicating

that Respondents' counsel had made "two minor edits," including to the tax-related term.  See Resp'ts' Ex. 22.  On May 10, 2021, Mr. Ilgenfritz emailed Mr. Fruin with a redlined version of the settlement agreement indicating that Respondents' edits to the tax-related term had been rejected and inserting additional language regarding the scope of the release clause.  See Pet'r's Ex. 24.  It was at this point that settlement negotiations between the parties broke down, culminating in the filing of the Motion to Reopen the Case [D.E. 16].  See Tr. [D.E. 49 at 36:6–40:15].

The parties' "ongoing negotiations and the failure to reach a final settlement demonstrate that the case and controversy remained alive." Parsons v. Orthalliance, Inc., 130 F. App'x 353, 356–57 (11th Cir. 2005); see also Roland Corp., 2020 WL 10818391, at *4 (same).  "The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs – not on the parties having meant the same thing but on their having said the same thing." Robbie v. City of Miami, 469 So. 2d 1384, 1385 (Fla. 1985) (emphasis added) (quoted in Perez-Perez, 2019 WL 5291097, at *2).  Here, the parties were not saying the same thing about the tax-related and release terms—the former being of great import to Petitioner, and the latter, to Respondents. See, e.g., Tr. [D.E. 49 at 38:14–39:8] (Mr. Fruin's testimony about the significance of the release term); id. at 122:16–125:20 (Mr. Lannon's testimony about the tax-related term and its importance to Mrs. Schottenstein).  Rather than indicate his clear acceptance of Respondents' May 6th draft offer, Mr. Ilgenfritz responded on May 10, 2021 by modifying the tax-related and release terms pursuant to his client's wishes. See Pet'r's Ex. 24.  "This conditional response with terms that were different from those made by [Respondents' counsel was] not an acceptance, but a counteroffer." Ahrens Enters., 2018 WL 6519106, at *3.  Moreover, Mr. Ilgenfritz testified that in a phone conversation with Mr. Fruin on or about May 19, 2021, Mr. Fruin rejected his May 10th draft offer. See Tr. [D.E. 49 at 98:8–20].  Thus, the parties failed to

assent to all sufficiently specific and mutually agreed upon terms by May 6, 2021.  See Perez-Perez, 2019 WL 5291097, at *2; see also 6600 Suemac Place, LLC v. Glass, No. 3:16-cv-1417-J-39JBT, 2018 WL 11319833, at *9 (M.D. Fla. March 25, 2018) ("The undisputed evidence establishes that the parties, through their conduct and words exchanged, had not reached an agreement on the scope of the proposed release as of March 6, 2017, as Poma contends."). Therefore, the undersigned concludes that Petitioner and Respondents did not enter into an enforceable settlement agreement on May 6, 2021.

### III.     Mr. Burns' interactions with Mr. Fruin did not bind Petitioner.

Petitioner also argues that Respondents did not "offer evidence to prove that Mr. Burns had clear and unequivocal authority to enter into [a settlement] agreement" on May 6, 2021.  See Opposition [D.E. 25 at 13–14].  "Florida law demands that before a settlement agreement may be recognized as valid, the party seeking to compel enforcement must show that the subject attorney had clear and unequivocal authority to settle on the client's behalf."  Baratta v. Homeland Housewares, LLC, No. 05-60187-CIV, 2007 WL 2668585, at *2 (S.D. Fla. June 14, 2007) (approving report and recommendation) (emphasis in original); see also Welch v. North Am. Tank Line, Inc., No. 8:06–CIV–2340–T–17–MAP, 2008 WL 3982394, at *3 (M.D. Fla. Aug. 25, 2008) (adopting report and recommendation) (same); B.T. by and through Tompson, 2017 WL 4868788, at *2 (same).

At the evidentiary hearing, Mr. Burns testified that Mr. Lannon was in communication with Petitioner about the tax-related issues in the settlement agreement.  See Tr. [D.E. 49 at 114:19–115:4].  Mr. Burns further stated that he "deferred" to Mr. Lannon on these issues and that any settlement between the parties would have had to be "subject to Mr. Lannon's approval."  Id. at 116:2, 117:3.  Mr. Burns further stated that he had told Mr. Fruin that Mr. Lannon's approval "was required," as Mr. Lannon was "captain[ing]" Petitioner's legal representation at that point.  Id. at

117:21–118:3.  Thus, Respondents failed to establish that Mr. Burns had the clear and unequivocal authority from his client to settle this dispute in May without Mr. Lannon's final input.  See 6600 Suemac Place, 2018 WL 11319833, at *9 ("[T]he evidence establishes that Ford was required to obtain his client's assent to each term negotiated, and that Poma's counsel Costello was aware of this fact.").  Thus, the undersigned concludes that Mr. Burns' interactions with Mr. Fruin did not bind Petitioner.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Respondents' Motion to Enforce Settlement [D.E. 20] be DENIED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have fourteen days from the date of this Report and Recommendation to file written objections, if any, with the Honorable Beth Bloom.  Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 14th day of January, 2022.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Beth Bloom
       Counsel of Record