**IN THE UNITED STATED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | |
|---|---|
| **BEVERLEY B. SCHOTTENSTEIN,** ) | |
| **Individually and as Co-Trustee Under the** ) | |
| **Beverley B. Schottenstein Revocable** ) | |
| **Trust U/A/D April 5, 2011, as Amended,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No. 1:21-cv-20521-BB** |
| ) | |
| **J.P.   MORGAN   SECURITIES,   LLC;** ) | |
| **EVAN A. SCHOTTENSTEIN; and AVI E.** ) | |
| **SCHOTTENSTEIN,** ) | |
| ) | |
| **Respondents.** ) | |

**RESPONDENTS EVAN AND AVI SCHOTTENSTEIN'S
AMENDED MOTION TO VACATE ARBITRATION AWARD AND
<u>OPPOSITION TO BEVERLEY SCHOTTENSTEIN'S PETITION TO CONFIRM</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iv

JURISDICTION ...........................................................................................................1

VENUE .........................................................................................................................1

PRELIMINARY STATEMENT ....................................................................................1

FACTS ..........................................................................................................................2

    A.    The Parties ..................................................................................................2

    B.    From 2006 to 2018 Petitioner Invests With Evan Schottenstein at Morgan
          Stanley, and then J.P. Morgan, and Makes a Profit of Over $31 Million. ...............3

    C.    In July 2019, Petitioner Files a FINRA Arbitration
          Contending *All* Trading In Her Account Was Unauthorized. ..................................4

    D.    The Panel, Over Respondents' Objections, Orders
          the Final Hearings to Proceed Virtually Rather Than In Person. ...........................5

    E.    Respondents Object to the Appointment and Improper
          Classification of Replacement Arbitrator James Scutti. ..........................................6

    F.    The Testimony of Petitioner's Granddaughter, Cathy Schottenstein Pattap,
          Leads to the Discovery of Documents Improperly Withheld in Discovery ............7

    G.    Two Important Non Parties Refuse to Comply with Panel
          Subpoenas Citing The Lack of a Physical Hearing Location. ..............................10

    H.    At the Hearing the Panel Refuses to Admit Video Evidence, Including
          Petitioner Saying, "I would Put More Into [Coatue] If I Could." .........................11

    I.    Rather than Pay Attention to the Proceedings, the Arbitrators
          Texted, Chatted, Slept, and Repeatedly Wandered Off Camera ...........................12

    J.    The Panel Issues an Award In Favor of Petitioner. ..............................................13

ARGUMENT ...............................................................................................................13

I.    By Refusing to Postpone the Hearing Until It Could Be Held in Person,
    The Arbitrators Were Guilty of Misconduct Prejudicial to Respondents. ........................14

II.    In Withholding Documents and Soliciting Privileged Information
    From Respondent, Petitioner Procured the Award by "Undue Means." ..........................17

III.    The Arbitrators Failed to Make Required Disclosures  and
Otherwise Exhibited "Evident Partiality." ...........................................................................19

        A.    Arbitrator Solomon Failed to Disclose a Personal Lawsuit
Against Evan Schottenstein's Subsequent Employer, State Farm ......................19

        B.    Arbitrator Scutti Was Misclassified as a Public Arbitrator and
Exhibited Evident Partiality When That Classification Was Challenged ...........20

        C.    Arbitrator Scutti Employed Petitioner's
Handwriting Expert In a Previous Case................................................................22

IV.    The Arbitrators Refused to Hear Video Evidence, Including Petitioner
Saying, "I Would Put More Into [Coatue] If I Could". ....................................................25

V.    Through Their Repeated Inattention to the Proceedings
the Panel Was Guilty of Misbehavior Prejudicial to Respondents. ...................................26

VI.    The Petition to Confirm the Award Should be Denied and a
Decision on Petitioner's Entitlement to Attorneys' Fees Should be Deferred. .................27

REQUEST FOR HEARING .........................................................................................................28

CONCLUSION..............................................................................................................................28

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*A.G. Edwards & Sons, Inc. v. McCollough*,
   967 F.2d 1401 (9th Cir. 1992) ......................................................... 18

*Bonar v. Dean Witter Reynolds, Inc.*,
   835 F.2d 1378 (11th Cir.1988) ....................................................... 1, 17

*CM S. E. Texas Houston, LLC v. CareMinders Home Care, Inc.*,
   662 F. App'x 701 (11th Cir. 2016) ................................................. 16

*Commonwealth Coatings Corp. v. Continental Cas. Co.*,
   393 U.S. 145 (1968) ......................................................................... 19

*Crow Constr. v. Jeffrey M. Brown Assoc. Inc.*,
   264 F. Supp. 2d 217 (E.D. Pa. 2003) ............................................. 24

*Gianelli Money Purchase Plan & Tr. v. ADM Inv'r Servs., Inc.*,
   146 F.3d 1309 (11th Cir. 1998) ..................................................... 23, 24

*Hoolahan v. IBC Advanced Alloys Corp.*,
   947 F.3d 101 (1st Cir. 2020) .......................................................... 17, 18

*Hott v. Mazzocco*,
   916 F. Supp. 510 (D. Md. 1996) ..................................................... 27

*Ins. Co. of N. Am. v. St. Paul Fire & Marine Ins. Co.*,
   215 A.D. 2d 386, (N.Y. App. Div. 1995) ....................................... 14, 16

*Johnson v. Directory Assistants Inc.*,
   797 F.3d 1294 (11th Cir. 2015) ..................................................... 25

*Klein v. Drexel Burnham Lambert, Inc.*,
   737 F. Supp. 319 (E.D. Pa. 1990) ................................................... 3

*Laminoirs-Trefileries-Cableries de Lens, S.A. v. Southwire Co.*,
   484 F. Supp. 1063 (N.D. Ga. 1980) ............................................... 14

*Lexington Ins. Co. v. Southern Energy Homes, Inc.*,
   101 So. 3d 1190 (Ala. 2012) ........................................................... 23

*Liberty Sec. Corp. v. Fetcho*,
   114 F.Supp.2d 1319 (S.D. Fla. 2000) ............................................ 17

iv

*Lifecare Int'l, Inc. v. CD Med., Inc.*,
    68 F.3d 429 (11th Cir. 1995) ........................................................................ 23

*Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*,
    939 F.3d 1145 (11th Cir. 2019) ................................................. 5, 6, 15, 16

*Middlesex Mut. Ins. Co. v. Levine*,
    675 F.2d 1197 (11th Cir.1982) ............................................................... 23, 24

*Morgan Keegan & Co., Inc. v. Garrett*,
    495 F. App'x 443 (5th Cir. 2012) ................................................................ 19

*Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc.*,
    961 F. Supp. 1 (D.D.C. 1997) ............................................................... 14, 16

*Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    51 F.3d 157 (8th Cir. 1995) ........................................................................ 24

*PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*,
    187 F.3d 988 (8th Cir. 1999) ................................................................. 18, 19

*Positive Software Solutions, Inc. v. New Century Mortg. Corp.*,
    436 F.3d 495 (5th Cir. 2006) ....................................................................... 24

*Robbins v. Day*,
    954 F.2d 679 (11th Cir. 1992) ..................................................................... 25

*Schmitz v. Zilveti*,
    20 F.3d 1043 (9th Cir.1994) ....................................................................... 24

*Smiley v. State*,
    279 So.3d 26 (Fla. Dist. Ct. App. 2019) .................................................... 25

*State v. Smith*,
    641 So. 2d 849 (Fla. 1994) .......................................................................... 25

*Sun Ref. & Mktg. Co. v. Statheros Shipping Corp. of Monrovia, Liberia*,
    761 F. Supp. 293 (S.D.N.Y.) (vacating ....................................................... 24

*Tempo Shain Corp. v. Bertek, Inc.*,
    120 F.3d 16 (2d Cir. 1997) .......................................................................... 16

*Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*,
    304 F.3d 1331 (11th Cir. 2002) ............................................................. 19, 24

**Statutes**

9 U.S.C. § 7 ................................................................................................................ 18

9 U.S.C. § 9 ................................................................................................................ 27

9 U.S.C. § 10 ..................................................................................................... 1, 14, 27

9 U.S.C. § 10(a)(2) ................................................................................................. 2, 19

9 U.S.C. § 10(a)(3) ....................................................................................... 2, 16, 25, 27

9 U.S.C. § 10(a)(4) .................................................................................................... 27

9 U.S.C. § 10(c) ........................................................................................................ 14

15 U.S.C. § 78d ........................................................................................................ 21

28 U.S.C. § 1331 ......................................................................................................... 1

Fl. Stat. § 934.03 ...................................................................................................... 25

## JURISDICTION & VENUE

This Court has jurisdiction over this matter pursuant to Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, and this Court's federal question jurisdiction under 28 U.S.C. § 1331. Venue is appropriate in this Court because the arbitration hearing site was scheduled by the Financial Industry Regulatory Authority ("FINRA") to be Boca Raton, Florida.

## PRELIMINARY STATEMENT

Evan Schottenstein served as his grandmother's financial advisor for 12 years during which time her investment accounts generated over $31 million in profits. The two spoke constantly with over 2,480 phone calls between them in the last 4 and a half years of their professional relationship alone. Notwithstanding this constant communication and these exceptional returns, Petitioner Beverley Schottenstein ("Petitioner") filed a FINRA arbitration against Evan Schottenstein and his brother Avi Schottenstein ("Respondents") contending she never authorized a single trade in her account and that she should have made more. Beverley's FINRA Arbitration ultimately resulted in an award of over $18 million against Respondents and J.P. Morgan Securities ("J.P. Morgan").

Respondents do not bring this amended motion[1] to re-litigate the underlying facts of the case. Rather, they seek to vacate this award because it was the product of a broken and biased

---

[1] To the extent any concerns have been raised that this motion is untimely, those concerns have been overruled by this Court. *See* Order Denying Motion for Correction [ECF No. 73] at 4-5 ("[U]nlike the movant in *Cullen*, Respondents exercised due diligence in timely filing their Motion to Vacate. As such, Respondents are entitled to refile their Motion to Vacate.") Additionally, under Fed. R. Civ. P. 15, this filing is an amended motion to vacate/opposition/answer, which has been filed with the Court's leave and which arises out of the same "conduct, transaction, or occurrence" as set forth in Respondents' original submission. As such, this amended filing relates back to the date of Respondents' original submission and is timely filed. *See Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1382 (11th Cir. 1988) (holding that an amended motion to vacate arising out of the same transaction or occurrence as the original motion to vacate relates back to the date of the original motion to vacate "and is itself a timely motion.")

process which favored the rapid conclusion to an elderly Petitioner's case over every other consideration, including FINRA's own rules, impartiality, and fundamental fairness.

First, in response to the Coronavirus Pandemic, the Panel, over Respondents' objections, ordered that the hearings be held by Zoom, rather than in person. No FINRA rule, however, authorizes a panel to make such an order, and doing so contravenes the parties' agreement to arbitrate. In addition, the ruling deprived Respondents of critical documents and witnesses as a result of current Eleventh Circuit law that makes arbitral trial subpoenas enforceable only at in person hearings. This failure to postpone hearings on sufficient cause shown violates Section 10(a)(3) of the FAA. Second, Petitioner withheld detailed notes from discovery, including her own handwritten notes, which prejudiced Respondents both in discovery and at the hearing. Further, Petitioner's legal team for a period of at least 5 weeks, accepted confidential and privileged information that Petitioner's granddaughter repeatedly solicited from Respondent Evan Schottenstein. Through these actions Petitioner procured the award through "undue means," in contravention of Section 10(a)(1) of the FAA. Third, two of the arbitrators failed to make required disclosures about their background or connection to witnesses or otherwise exhibited "evident partiality" in violation of FAA Section 10(a)(2).

Fourth, at the hearing the arbitrators "refused to hear" contemporaneous video evidence of Petitioner saying, "I would have put more into [Coatue] if I could," Coatue being a $5 million investment that she claimed she knew nothing about. Finally, rather than giving these proceedings the attention they deserved, the panel instead texted, slept, and repeatedly wandered off camera. Thus, "the arbitrators were guilty of . . . misbehavior by which the rights of [Respondents] have been prejudiced[.]" 9 U.S.C. § 10(a)(3). In light of the many different ways in which the fairness and integrity of this arbitration broke down, even under the extremely limited review afforded to arbitration awards, this Award cannot, and should not, stand.

## FACTS

A.    The Parties

Petitioner Beverley Schottenstein ("Petitioner") is an exceptionally wealthy woman who resides in Bal Harbor, Florida and has a net worth well in excess of $100 million. Petitioner inherited considerable wealth in 1984 when her husband, Alvin Schottenstein, passed away. (Statement of Claim at 4, Fruin Decl. Ex. 1.) Alvin was the president of Schottenstein Stores Corporation[2] as well as Consolidated Stores Corporation and through those positions acquired significant wealth.[3]

Respondent Evan Schottenstein, Petitioner's grandson, is a resident of New York, New York. He graduated with honors from Yeshiva University with a degree in finance and worked from 2006 to 2014 at Smith Barney, which later became Morgan Stanley. After ten years at Morgan Stanley / Smith Barney, Evan moved to J.P. Morgan in March 2014.

Respondent Avi Schottenstein is also Petitioner's grandson. He graduated from Yeshiva University in 2008 and joined Smith Barney as a financial advisor associate in 2009. He remained there through the joint venture with Morgan Stanley, and moved to J.P. Morgan with his brother in March 2014.[4] Avi currently lives in Los Angeles, California.

---

[2]    Schottenstein Stores consisted of Schottenstein Department Stores, Value City Department Stores, Value City Furniture, and numerous other clothing companies and real estate holdings. Consolidated Stores Corporation was the parent corporation of Big Lots, Little Lots, and Odd Lots, all of which were later rebranded under the trade name Big Lots.

[3]    Petitioner is no stranger to intra family lawsuits over money. In 1985, shortly after her husband passed away, Petitioner sued her brothers-in-law over the family business. *Schottenstein, et al. v. Schottenstein, et al.*, U.S. District Court, Southern District of Ohio (Columbus), Case No. 2:85-CV-01929 (filed December 6, 1985). Likewise, a few years later Petitioner and her close friend Norma Klein sued Klein's son, who was their broker at Drexel Burnham, over the pair's investment losses relating to the 1987 stock market crash. *See* Rs' Ex. 150, *Klein v. Drexel Burnham Lambert, Inc.*, 737 F. Supp. 319 (E.D. Pa. 1990), Fruin Decl. Ex. 2.

[4]    Avi Schottenstein was not Petitioner's financial advisor at J.P. Morgan and he did not provide her investment-related advice. His role was primarily administrative, supporting his brother Evan as needed. He also worked to develop business for Evan and other J.P. Morgan advisors in his office.

B.     From 2006 to 2018 Petitioner Invests With Evan Schottenstein at Morgan
       Stanley, and then J.P. Morgan, and Makes a Profit of Over $31 Million.

Petitioner began investing with Evan Schottenstein in 2006, while he was at Smith Barney.

During her time at Smith Barney, and later by merger, Morgan Stanley, Petitioner maintained a

diversified portfolio, which included individual stocks, municipal and corporate bonds, and

structured notes. Contrary to later allegations that she knew nothing about structured notes,

Petitioner purchased 113 different structured notes while at Morgan Stanley and made a net profit

on these investments of $1.36 million. (JPMS Ex. 56, Fruin Decl. Ex. 3.) Overall, at Morgan

Stanley Smith Barney, Petitioner's accounts had a net out of pocket gain of $21,013,720. (*See*

JPMS Ex. 62, Fruin Decl. Ex. 4.)

In March 2014, Evan and Avi Schottenstein moved to J.P. Morgan and Petitioner followed

them. (Statement of Claim at 5-6, Fruin Decl. Ex. 1.) While at J.P. Morgan, Petitioner again

invested in a series of diversified investments including common stocks, preferred stocks,

corporate and municipal bonds, and structured notes. While he was her financial advisor, Evan and

his Grandmother spoke constantly. Indeed, Petitioner's own telephone records show that, from

March 2014 to November 2018, Evan and Beverley had 2,484 phone calls lasting a combined total

of 19,531 minutes or 326 hours. (Rs' Ex. 133, Fruin Decl. Ex. 5.) Further, at J.P. Morgan

Beverley's accounts were again profitable, experiencing a net out of pocket gain of $9,757,904.

(JPMS Ex. 42 at 1, Fruin Decl. Ex. 6.)[5] Thus, for the entire time Evan Schottenstein served as

---

[5]     Furthermore, contrary to the allegations of excessive compensation, while at J.P. Morgan, neither Evan nor Avi
Schottenstein, made an overwhelming amount of money from Petitioner's Account. For Petitioner's account Evan
Schottenstein made total gross commissions (paid by Petitioner) and concessions (paid by third parties such as
underwriters) of $3,283,163. (*See* Cl's Ex. 171, Fruin Decl. Ex. 7.) Evan Schottenstein received approximately
40% of this amount as a payout ($1,313,265) with the remaining percentage kept by his employer. (*See* Tr. 453:22-
454:9, Fruin Decl. Ex. 8.) Over the 5 years that he worked as petitioner's financial advisor at J.P. Morgan, that
equated to just under *$263,000* per year before taxes on an account with an average value of over $70 million.
(*See* JPMS Ex. 42, p.1, Fruin Decl. Ex. 6.)

        For Avi Schottenstein, the figures are even more dramatic. Between May 2016 and May 2019 Avi made $602,251
in gross commissions attributable to his grandmother's account. (*See* C's Ex. 171, Fruin Decl. Ex. 7.) However,
it is undisputed that Avi Schottenstein received at most 28% of those gross commissions ($168,630) with the rest

Petitioner's financial advisor, her investments returned a net out of pocket **profit** of $31,534,142.23.

C.      In July 2019, Petitioner Files a FINRA Arbitration
        Contending *All* Trading In Her Account Was Unauthorized.

Notwithstanding these significant profits and extensive communication, on July 24, 2019, Petitioner filed a FINRA arbitration against her grandsons and J.P. Morgan alleging that they had engaged in unauthorized trading in Petitioner's Account. Petitioner maintained that Evan never discussed a single trade in her J.P. Morgan account. (Statement of Claim at 7 and Tr. 1687:2-25, Fruin Decl. Exs. 1 & 8[6].). She further alleged that the structured note purchases in her account were all unauthorized and that her holdings of Apple and Big Lots were sold without her knowledge or approval. (Statement of Claim at 8, Fruin Decl. Ex. 1.) Finally, she contended that she knew nothing about a $5 million commitment she made to invest in a hedge fund called the Coatue Early Stage Fund ("Coatue"). (Statement of Claim at 11-12, Fruin Decl. Ex. 1.) Respondents answered[7] and all parties submitted Uniform Submission Agreements. *See* Petition [ECF No. 1], Ex. B.

As required by FINRA's Code of Arbitration Procedure, on September 16, 2019, FINRA provided a list of 35 proposed arbitrators to the parties, from which they were to select a panel by a system of "ranks" and "strikes." *See* FINRA Rule 12403. The list of thirty-five proposed

---

going to his employer. (*See* Tr. 1445:10-19, Fruin Decl. Ex. 8.) As such, for the 3 years he earned commissions on his grandmother's account, Avi Schottenstein made only **$56,210** per year, before taxes.

[6]     For the Court's convenience all transcript excerpts from the Final Hearing have been compiled into one exhibit, attached to the Fruin Decl. as Ex. 8.

[7]     In addition to addressing each of the specific allegations leveled against them, Respondents have also made the broader point that the FINRA Arbitration was the result of the undue influence that certain family members have had on Petitioner in order to gain control of her estate. It is a pre-text for one branch of Petitioner's family to lay claim to the share of Petitioner's estate that would have otherwise have gone to Respondents' father, Robert ("Bobby") Schottenstein. Bobby, one of Petitioner's four children, would have received approximately 25% of the estate upon Petitioner's death. Instead, in 2019, the same year the Arbitration was filed, Petitioner changed her will and trust no fewer than 5 times and has now entirely removed Bobby and Bobby's family from her estate plan.

arbitrators was accompanied by their affirmative initial disclosures, on which the parties relied to make their selections. After the parties submitted their ranks and strikes to FINRA, FINRA appointed a panel in October 2019 consisting of Donna Solomon (Chairperson); David Rich (Public panelist); and Donald Ryce (Public panelist).

        D.      The Panel, Over Respondents' Objections, Orders
                   the Final Hearings to Proceed Virtually Rather Than In Person.

On July 23, 2020, in response to the cancellation of in-person hearings by FINRA due to the Coronavirus pandemic, Petitioner made a motion to hold the final hearings by Zoom teleconference. Respondents opposed Petitioner's motion arguing that neither the Parties' Arbitration Agreement (Fruin Decl. Ex. 9.) nor FINRA Rules provides for Virtual Hearings, particularly over one party's objection. (*See* Respondents' Opposition to Zoom Motion, Fruin Decl. Ex. 10.) Furthermore, Respondents pointed out that under the applicable Eleventh Circuit law of *Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145 (11th Cir. 2019), in order for an arbitral trial subpoena to be effective it requires a witness to appear in person before an arbitral panel, not by means of videoconference. (*Id.*) Accordingly, Respondents argued that "[a] virtual hearing could significantly impair the parties' and the Panel's ability to compel documents and testimony from non-FINRA member third parties." (*See Id.*) Notwithstanding Respondents' objections, on August 27, 2020, the Panel ordered the final hearings to proceed via Zoom teleconference. (Panel Order dated 08/18/2020, Fruin Decl. Ex. 11.)

        E.      Respondents Object to the Appointment and Improper
                   Classification of Replacement Arbitrator James Scutti.

On September 28, 2020, just less than a month before the final hearings were to begin, Public Arbitrator Donald Ryce, Jr. withdrew from the panel due to illness and, shortly thereafter, passed away. The parties jointly requested a short list of replacement arbitrators to rank and strike in order to replace Arbitrator Ryce. FINRA, however, never acted on the parties' request. (*See*

10/5/2020 Letter from J. Brennan to L. Lasher, Fruin Decl. Ex. 12.) Instead, on October 13, 2020, six days before the start of the final hearings, FINRA unilaterally appointed James Scutti as a replacement **Public** Arbitrator. (*See* 10/13/2020 Letter from L. Lasher, Fruin Decl. Ex. 13.).

As a result of Arbitrator Scutti's prior employment with the Securities Exchange Commission and his extensive prior practice in securities disputes, J.P. Morgan and Respondents challenged Arbitrator Scutti's classification as a Public Arbitrator and, accordingly, as a valid replacement arbitrator under FINRA Rules.[8] (*See* 10/14/2020 and 10/15/2020 Letters to FINRA, Fruin Decl. Exs. 14 & 15.) Notwithstanding these arguments, FINRA's Director of Dispute Resolution denied Respondents' motion to remove Arbitrator Scutti as a misclassified arbitrator. (*See* 10/15/2020 Director Denial, Fruin Decl. Ex. 16.)

On October 15, 2020, a FINRA staff member called Arbitrator Scutti to ask him clarifying questions in an attempt to determine whether Arbitrator Scutti was properly classified as a public arbitrator. (*See* 10/15/2020 FINRA Letter, Fruin Decl. Ex. 17.) The FINRA representative improperly disclosed to Arbitrator Scutti that there was a challenge to his classification as a public arbitrator, at which point Arbitrator Scutti inquired if the "industry party" had challenged his status and went on to ask "if it was JP Morgan." (*See Id.*) The FINRA staff member then "confirmed that it was JP Morgan." (*See Id.*)

Accordingly, Respondents and J.P. Morgan petitioned under FINRA Rule 12407, to have Arbitrator Scutti removed based on the bias and lack of impartiality displayed in that improper exchange. (*See* 10/15/2020 and 10/16/2020 Letters, Fruin Decl. Exs. 18 & 19.) The Director overruled Respondents' claims of partiality and bias and instead affirmed Arbitrator Scutti's appointment to the arbitration panel. (*See* 10/16/2020 FINRA Letter, Fruin Decl. Ex. 20.)

---

[8]   Pursuant to FINRA Rule 13411, as Mr. Ryce was a Public Arbitrator, FINRA was required to replace him with a Public Arbitrator.  *See* FINRA Rule 13411(d).

The issues surrounding Arbitrator Scutti continued into the hearing. On the evening of October 22, 2020, just three days before Petitioner's handwriting expert, Frank Harley Norwitch, was to testify, Arbitrator Scutti disclosed he had previously employed Mr. Norwitch as a handwriting expert in an investment dispute where he represented the claimant. To explain this late disclosure, Arbitrator Scutti stated that FINRA did not include Exhibits Lists or Witness Lists in the materials it sent to him, which would have notified him of Petitioner's intention to call Mr. Norwitch as a witness. (*See* 10/22/2020 Disclosure from Scutti, Fruin Decl. Ex. 21.) Respondents and J.P. Morgan again moved to have Arbitrator Scutti removed as an arbitrator. (*See* 10/23/2020 and 10/26/2020 Letters, Fruin Decl. Exs. 22 & 23.) On October 26, 2020, the Director yet again denied Respondents' request to remove Arbitrator Scutti. (*See* 10/26/2020 FINRA Letter, Fruin Decl. Ex. 24.)

> F.      The Testimony of Petitioner's Granddaughter, Cathy Schottenstein Pattap,
>         <u>Leads to the Discovery of Documents Improperly Withheld in Discovery.</u>

On October 21, 2020, during the final hearing of this matter, Petitioner's counsel called Cathy Pattap Schottenstein ("Pattap") as a witness.  During Pattap's testimony, it was discovered that Pattap and another of her cousins, Alexis Schottenstein[9] ("Alexis"), had drafted an eight-page single-spaced statement that outlined in great detail the alleged misconduct of Evan Schottenstein. (C's Ex. 205, Fruin Decl. Ex. 25; Tr. 816:18-817:14; 903:24-905:21; 976:1-18, Fruin Decl. Ex. 8.). Pattap sent this statement to Petitioner's counsel on June 24, 2019, one month before the Statement of Claim was filed on July 25, 2019. *Id.* Pattap's statement to Petitioner's counsel was extensive – detailing family background, accusations, causes of action, and timelines of Evan and Avi's alleged misconduct. *Id.* The Statement of Claim was clearly based on Pattap's statement to

---

[9]     Pattap and Alexis are first cousins of the Schottenstein Respondents, Evan and Avi, and Petitioner's granddaughters.

counsel, which was never produced to Respondents during Discovery.[10] (*Compare* Statement of Claim to C's Ex. 205, Fruin Decl. Ex. 25.).[11]

The production of the eight-page statement led Respondents to another critical discovery. Petitioner had maintained a "black book" containing handwritten notes related to her claims in the arbitration, (C's Ex. 205, p. 11, Fruin Decl. Ex. 25.), which Petitioner had furnished to her counsel in June 2019. (Pattap Tr. 855, Fruin Decl. Ex. 8.) Petitioner, however, had not disclosed the existence of the "black book," nor produced it to Respondents in discovery.[12] The "black book" contained allegations of theft by Evan and Avi Schottenstein from Claimant's Chase Bank Account. Specifically, the "black book" alleged that in September 2018, Chase Bank advised Petitioner that all checks were stopped due to "too much activity." (Black Book, Rs' Ex. 192 at 3, Fruin Decl. Ex. 26.) Petitioner wrote that she went to the bank to get statements from "2016-2018" and that upon examination, Petitioner found "thousands and thousands of dollars" had been withdrawn from her checking account without her knowledge. (*Id.*) The "black book" also contained allegations of unauthorized charges on Petitioner's credit and debit cards. (*Id.* at 4-5)

Before the hearing, on March 23, 2020, the Schottenstein Respondents had requested that the Panel issue a subpoena to non-party Chase Bank for Petitioner's credit card statements. (*See* Fruin Decl. Ex. 27.). After this subpoena request and knowing the "black book" contained material relevant to this subpoena, Petitioner continued to withhold the "black book" from discovery and

---

[10]   FINRA Discovery Guide List 2, Items 5, 10, and 13 require Petitioner to produce documents related to the transactions challenged in the Statement of Claim; third-party statements related to the dispute; and documents received by the Petitioner that are related to the allegations in the Statement of Claim.

[11]   Furthermore, Petitioner failed to produce over 500 pages of documents reflecting communications between Alexis Schottenstein and Petitioner's counsel before the filing of the Statement of Claim. In response to a motion to compel made by Respondents' counsel during Ms. Pattap's testimony, Petitioner agreed, belatedly, to produce those documents at the hearing. (*See* Tr. 869:5 – 870:19, Fruin Decl. Ex. 8.)

[12]   FINRA Discovery Guide, List 2, Items 7 and 10, required Petitioner to produce diary entries and statements related to the allegations in the Statement of Claim. Petitioner's "black book" was plainly responsive to those List Items.

also vigorously opposed Respondents' subpoena. (*See* Cl.'s 3/23/2020 Opp., Fruin Decl. Ex. 28.) ("[T]he documents sought by the [subpoenas to Chase Bank and American Express] constitute an overly broad fishing expedition into Claimant's personal financial affairs and seek the production of documents that have nothing whatsoever to do with the issues in this case."). Based on Petitioner's arguments, the Panel ultimately denied Respondents' request for a subpoena to Chase Bank. (*See* 4/20/2020 Decision, Fruin Decl. Ex. 29.) Nevertheless, at the hearing Petitioner, through the "black book" and her own testimony, accused Respondents of theft from her Chase Bank Accounts. *See* Black Book, Rs' Ex. 192 at 4, Fruin Decl. Ex. 26 ("As of today 10-31-2018 – they are still using my debit and credit accounts."); Black Book, Rs' Ex. 192 at 5, Fruin Decl. Ex. 26 ("As of today – Nov. 15, 2018, I still believe they all use my credit card without my permission. the [sic] only solution is cancel the cards and say ByBy to Evan and Avi."); Tr. 3612:4-5, Fruin Decl. Ex. 8 ("They were using my money to go to Israel for [Avi's] wedding."); Tr. 2101:8-19, Fruin Decl. Ex. 8 ("Q. Do you believe that they actually took money out of their -- your account for their own benefit? A. Yes, I do. Yes, I do. . . . Q. How much? A. Millions. . . they took millions."). Respondents were prevented from obtaining the Chase Bank Account materials, which would have proven the utter falsity of those allegations and demonstrated that it was other family members, particularly Alexis Schottenstein, who were responsible for this spending out of Petitioner's Chase Bank Accounts.

In addition to the 8 page notes and the "black book," Pattap also testified that she had routinely solicited privileged information from her cousin Evan and relayed the contents of those communications to Petitioner's legal team. Pattap's text messages to Evan reveal that she texted him frequently often under the guise of trying to broker a peace in the family, but was really just

plying him for privileged and confidential information about his communications with his lawyers, his defense strategy, and family pictures for use in articles she was pitching to the media.[13]

Finally, in Pattap's testimony the Panel learned that in August 2020, Evan Schottenstein interviewed for a position with State Farm Insurance in Englewood, New Jersey and was actually hired by State Farm shortly before the final hearings began. (*See* Tr. at 769:6-17; 939:16-20 and Rs' Ex. 100 at 92, Fruin Decl. Exs. 8 and 34.) Through the work of a private investigator after the Hearing, Respondents learned that just months before this testimony, Chairperson Donna Solomon and her husband sued State Farm Insurance company in Florida State Court but did not disclose that lawsuit to the parties. In her lawsuit, Arbitrator Solomon claimed that State Farm wrongfully denied a claim for property damage under her homeowner's policy and sought damages of between $15,000 and $30,000. (Solomon Complaint at 2, Fruin Decl. Ex. 32.) This lawsuit was not disclosed to the parties before or during the hearing and it likewise did not appear in an update Arbitrator Solomon made to her Disclosure Form after Week 3 of the hearing and before Weeks 4 and 5. (Solomon 11/9/2020 Disclosure Report, Fruin Decl. Ex. 33.).[14]

G.    Two Important Non Parties Refuse to Comply with Panel
      Subpoenas Citing The Lack of a Physical Hearing Location.

In advance of the final hearings, Respondents sought witness testimony and trial documents from Wells Fargo Bank, N.A. and Alexis Schottenstein, but were unable to force either to comply with validly issued trial subpoenas because the arbitration was proceeding by Zoom rather than in person. On September 15, 2020, the Panel issued a Subpoena for the Appearance of Alexis E.

---

[13]   (*See* Rs' Ex. 100, pp. 114, 116, 131, 139, 153, Fruin Decl. Ex. 31.) ("Is it helpful in the case? What does your lawyer say since she mailed all those letters etc.;" "Do you still have that meeting with the lawyer today?" "How was the lawyer meeting today?" "How did the rest of today go with the lawyers?")

[14]   Arbitrator Solomon's lawsuit against State Farm was not the only undisclosed lawsuit turned up by Respondents' investigator. Arbitrator Rich and his wife pursued a consumer lawsuit against Sandy's Landscaping and Sanford Stein in 1979. (*See* Rich Docket, Fruin Decl. Ex. 34.) That lawsuit was not disclosed on Arbitrator Rich's Arbitrator Disclosure form. (*See* Rich 8/28/2020 Disclosure Report, Fruin Decl. Ex. 35.)

Schottenstein and the Production of Documents ("September 15 Trial Subpoena"). (9/15/2020 Subpoena, Fruin Decl. Ex. 36) Alexis,[15] however, refused to comply with the Panel's September 15 Trial Subpoena. *See* 10/9/2020 Email from David Weintraub, Fruin Decl. Ex. 37. Likewise, on October 8, 2020, Respondents provided a Panel-executed trial subpoena to Wells Fargo. (9/23/2020 Wells Fargo Subpoena, Fruin Decl. Ex. 38.)[16] Wells Fargo advised Respondents that it would not comply with the Panel-issued trial subpoena.

Respondents sought to compel compliance with the subpoenas by filing a Petition in this Court. *See* 10/19/2020 Petition to Enforce Arbitration Subpoenas, Fruin Decl. Ex. 40. In opposition to that Petition, both Alexis and Wells Fargo asserted that the subpoenas were unenforceable because the Arbitration Final Hearing was proceeding by Zoom rather than in person. (*See* Alexis Mot. to Dismiss at 3, Fruin Decl. Ex. 41; Wells Fargo Opp. at 5, Fruin Decl. Ex. 42.)

> H.    At the Hearing the Panel Refuses to Admit Video Evidence, Including Petitioner Saying "I Would Put More Into [Coatue] If I Could."

During the hearing, Respondents attempted to introduce multiple videos of Petitioner during her cross examination. These videos, which run 49 minutes in length, were taken on January 10, 2019, four days after Petitioner's January 6, 2019 complaint to J.P. Morgan. In these contemporaneous videos, Petitioner admits that not only did she fully authorize the Coatue investment she later disclaims, but that she would have made an even larger investment in Coatue

---

[15]    Respondents sought Alexis's testimony because, as discussed above, she was instrumental in developing Petitioner's claims against Respondents. She first accessed Petitioner's Trust Account documents to review them with her, and she dictated a letter for Petitioner to write in her hand on January 6, 2019, which contained many of the claims that eventually ended up in the Statement of Claim.

[16]    Beginning in 2009 and continuing until 2013, Wells Fargo employed Alexis in its Largo, Florida bank branch. On information and belief, Wells Fargo terminated Alexis in 2013 due to numerous customers' complaints that Alexis enrolled their respective Wells Fargo accounts in online statement delivery without their knowledge and/or consent. (*See* 6/24/2020 Motion for Wells Fargo Subpoena, Fruin Decl. Ex. 39.) Given the striking similarities between Alexis's actions at Wells Fargo and the allegations made by Petitioner in this arbitration -- that Petitioner was enrolled in electronic delivery of her J.P. Morgan Statements without her knowledge or consent -- Respondents sought documents from Wells Fargo on this topic.

if she was able. On a phone call with Evan, who was reminding her of their conversations about Coatue, Claimant says, unprompted, "I'd even put more into it if I had to," and "I would put more into it if I could." (Rs' Exs. 127, 130, Fruin Decl. Exs. 43, 44.) Furthermore, upon being told that there were no losses in her J.P. Morgan account and that her accounts were valued at $90 million, Petitioner tellingly states, "I should have double." (Rs' Exs. 125, 128, Fruin Decl. Exs. 45, 46.) Upon Petitioner's motion, the Panel excluded these videos and refused to view or otherwise consider them for any purpose in the proceedings. (Tr. 2210:24-25, Fruin Decl. Ex. 8.)

I.    Rather than Pay Attention to the Proceedings, the Arbitrators
      Texted, Chatted, Slept, and Repeatedly Wandered Off Camera.

The final arbitration hearing lasted five weeks and included 43 virtual hearing sessions. Throughout the proceedings, the three arbitrators could be seen ignoring the hearings and instead using their phones, talking to others in their homes, sleeping, and leaving the camera frame altogether. *See* Arbitrator Misconduct Log, Fruin Decl. Ex. 47. Arbitrator David Rich was not present on camera on approximately 149 separate occasions, totaling nearly 3 hours. *Id.* On one such occasion, he was out of the camera frame for more than 4 minutes. Arbitrator David Rich Off-Camera Video, Fruin Decl. Ex. 48. Arbitrator Rich also appeared to be dozing off or sleeping on 54 occasions. *See* Fruin Decl. Ex. 47. At one point during the hearing, he took an almost seven-minute nap. Arbitrator David Rich Sleeping Video, Fruin Decl. Ex. 49. Likewise, Chairperson Donna Solomon appeared to be sleeping for more than 4 minutes on one occasion. Chairperson Donna Solomon Sleeping Video, Fruin Decl. Ex. 50. Additionally, she could be seen speaking to someone off-camera on 22 distinct occasions. *See* Fruin Decl. Ex. 47. Arbitrator James Scutti was similarly distracted during the hearing and appeared to be texting on his phone for a total of approximately 24 minutes during the hearing. *See, e.g.*, Arbitrator Misconduct Log, Fruin Decl. Ex. 47 and Arbitrator Scutti Phone Use Video, Fruin Decl. Ex. 51.

J.      The Panel Issues an Award In Favor of Petitioner

On February 5, 2021, the Panel issued its Award of $18,947,512 against Respondents and J.P. Morgan. The Panel found J.P. Morgan, Evan Schottenstein, and Avi Schottenstein "liable on the counts of constructive fraud/abuse of fiduciary duty and fraudulent misrepresentations and omissions" and found Respondents J.P. Morgan and Evan liable "for elder abuse in violation of Chapter 415, Fla. Statutes." (Award at Paras. 1-2, Petition [Dkt No. 1] Ex. B.) The Panel Ordered Evan to pay "the sum of $9,000,000 in compensatory damages" and ordered Avi to pay the sum of "$602,251.00 in compensatory damages . . ." (*Id.* at Paras. 4-5.)

In the Award, the Panel found Respondent J.P. Morgan liable for "the sum of $4,708,550.00 in compensatory damages" and also ordered J.P. Morgan to "rescind the Coatue investment and pay Claimant $4,291,450.00 . . ." (*Id.* at Paras. 3, 6.) Costs and legal fees of the award were split evenly between J.P. Morgan and Evan. (*Id.* at Paras. 7-10.).

## ARGUMENT

Section 10 of the Federal Arbitration Act ("FAA") permits federal district courts to vacate arbitration awards under four independent grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

FAA, 9 U.S.C. § 10.[17] A reviewing court will vacate an arbitration panel's award pursuant to the

---

[17]   Notably, FINRA's web site lists two additional grounds for vacatur, namely (1) manifest disregard of the law and (2) no factual or reasonable basis for the award. *See* https://www.finra.org/arbitration-mediation/decision-

FAA if the arbitrators have abused their discretion or denied either or both of the parties a fair hearing. *See* 9 U.S.C. § 10(c); *Laminoirs-Trefileries-Cableries de Lens, S.A. v. Southwire Co.*, 484 F. Supp. 1063, 1067 (N.D. Ga. 1980). This standard is met here.

## I. BY REFUSING TO POSTPONE THE HEARING UNTIL IT COULD BE HELD IN PERSON, THE ARBITRATORS WERE GUILTY OF MISCONDUCT PREJUDICIAL TO RESPONDENTS

In Late March 2020, FINRA began informing parties by email that it would administratively postpone all in-person arbitration and mediation proceedings due to Coronavirus considerations. (FINRA March 27, 2020 Email, Fruin Decl. Ex. 52.) Additionally, FINRA notified parties that it offers virtual hearing services (via Zoom and Teleconference) to parties "by joint agreement or by panel order." While Respondents commend FINRA's initiative, this approach by FINRA was simply invented out of thin air and was never the result of any official notice, comment, or rulemaking process overseen by the SEC. To the extent panels, such as this one, are ordering it, they are not doing so pursuant to any FINRA Rule.[18] *See Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc.*, 961 F. Supp. 1, 3 (D.D.C. 1997) (citing *Ins. Co. of N. Am. v. St. Paul Fire & Marine Ins. Co.*, 215 A.D. 2d 386, (N.Y. App. Div. 1995). As such, this arbitration was conducted in contravention of Paragraph 23 of the parties' Arbitration Agreement and Paragraphs 2 and 3 of the parties' Uniform Submission Agreements.[19]

---

award. While Respondents recognize that these grounds are no longer recognized in the Eleventh Circuit, if they still were, Respondents believe they would prevail on these grounds as well.

[18] Even the former Director of FINRA Dispute Resolution has opined that in order for a FINRA Panel to order a final hearing to go forward by videoconference over an objection, an amendment to the FINRA rules is likely necessary. *See* "Letter from the Editor: Change the Code to Support Virtual Hearings," Securities Arbitration Alert, May 8, 2020, Fruin Decl. Ex. 53 ("[I]n my view the Code does not clearly authorize arbitrators to hold hearings by videoconference absent party agreement.").

[19] Paragraph 23 of the Customer Agreement between Petitioner and J.P. Morgan provides "THAT CONTROVERSIES ARISING UNDER OR RELATING TO THIS AGREEMENT . . . SHALL BE DETERMINED BY ARBITRATION AND **IN ACCORDANCE WITH THE RULES OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. ("FINRA")** BEFORE AN ARBITRATION PANEL APPOINTED BY FINRA IN ACCORDANCE WITH ITS RULES AND SUCH HEARING OR HEARINGS SHALL BE CONDUCTED IN A LOCALE SELECTED BY FINRA." (*See* Arbitration Agreement, ¶ 23(a), Fruin Decl. Ex. 9.) (Emphasis added.)

The FINRA Code of Arbitration Procedure includes several provisions related to moving a hearing location (*see* FINRA Rules 12213, 12600, 12800), but no provision allows a panel to dispense with an in-person location entirely. Likewise, the Code expressly provides that certain limited proceedings may be conducted in a manner other than through an in-person hearing (*see* FINRA Rules 12500, 12501, 12206(b)(4), 12504(a)(5), 12800, and 12805), but the Code does not provide that normal final hearings may proceed by videoconference.

Further, this ruling operated to deprive Respondents of key documents and witnesses at the hearing. Under applicable Eleventh Circuit precedent, arbitrators may not compel third parties to produce documents without also compelling the third parties to appear in person at the hearing. *See Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1158-61 (11th Cir. 2019) ("Thus, the [Federal Arbitration Act] implicitly withholds the power to compel documents from non-parties without summoning the non-party to testify"). As the Eleventh Circuit explained further, the appearance of third parties must be ***in person and not by videoconference***. *Id.* at 1159-60 (an "arbitrator's subpoena power [is restricted] to situations in which the non-party has been called to appear in the ***physical presence of the arbitrator*** and to hand over the documents at that time") (emphasis added.).

In opposing Petitioner's motion for a virtual hearing, Respondents explicitly warned the Panel that given the Eleventh Circuit's "not by videoconference" language in *Managed Care,* a virtual hearing would deprive Respondents of their ability to compel documents and testimony from key third parties. And, in fact, that is precisely what happened. In opposing Respondents'

---

Likewise, Paragraphs 2 and 3 of the parties' Uniform Submission Agreement provide: "2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, **and the parties agree to be bound by these procedures and rules.** 3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). **The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.**" *See* Uniform Submission Agreements of the Parties, Petitioner's Petition [ECF No. 1], Ex. A (Emphasis added).

efforts to obtain documents and testimony at the final hearing Alexis Schottenstein and Wells Fargo repeatedly used exactly this argument.[20]

      This should not have happened. The panel should have instead postponed the hearings briefly until such time as they could be conducted in person. "[I]n refusing to postpone the hearing, upon sufficient cause shown" the arbitrators were "guilty of misconduct" meriting vacatur. *See* FAA § 10(a)(3); *see also Naing*, 961 F. Supp. at 3 ("[I]f the failure of an arbitrator to grant a postponement or adjournment results in the foreclosure of the presentation of 'pertinent and material evidence,' it is an abuse of discretion." (citing *Ins. Co. of N. Am. v. St. Paul Fire & Marine Ins. Co.*, 215 A.D. 2d 386, (N.Y. App. Div. 1995)); *see, e.g., CM S. E. Texas Houston, LLC v. CareMinders Home Care, Inc.*, 662 F. App'x 701, 704 (11th Cir. 2016) ("Prejudice might occur when, for example, the arbitrator's choice not to postpone a hearing entirely prevents a party from presenting a key witness' material, noncumulative testimony." (citing *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1997)). Indeed, even FINRA's own guidance on virtual hearings suggests that this hearing should have been postponed. *See* FINRA Arbitrator Resource Guide for Virtual Hearings, Fruin Decl. Ex. 54 (stating that even where a virtual hearing has been scheduled, the Panel "must" postpone the hearing "if the Panel believes the virtual hearing will result in unfairness to any party.").

---

[20]  *See* Alexis Mot. to Dismiss at 3, Fruin Decl. Ex. 41 ("*Managed Care* clearly held that 9 U.S.C. § 7's reference to the 'attendance' of a witness 'before' an arbitrator is limited to the physical, in-person appearance of the witness before the arbitrator. The Court concluded, 'Section 7 does not authorize district courts to compel witnesses to appear in locations outside the physical presence of the arbitrator, so the court may not enforce an arbitral summons for a witness to appear via video conference.'"); Wells Fargo Opp. at 5, Fruin Decl. Ex. 42 ("Accordingly, like *Managed Care*, this Court lacks authority to enforce the Wells Fargo Trial Subpoena since Wells Fargo would have to appear via video conference at the hearing and/or Wells Fargo would not be 'before' the Arbitration panel since the Arbitration panel is also attending the Arbitration by video-conference.").

## II.   IN WITHHOLDING DOCUMENTS AND SOLICITING PRIVILEGED INFORMATION FROM RESPONDENT, PETITIONER PROCURED THE AWARD BY "UNDUE MEANS."

A party procures an award by undue means where it engages in "intentional misconduct that measures equal in gravity to bribery, corruption, or physical threat to an arbitrator." *Liberty Sec. Corp. v. Fetcho*, 114 F.Supp.2d 1319, 1321 (S.D. Fla. 2000) (internal quotations omitted). Other circuits have defined "undue means" as "underhanded or conniving ways of procuring an award that are similar to corruption or fraud, but do not precisely constitute either." *Hoolahan v. IBC Advanced Alloys Corp.*, 947 F.3d 101, 112–13 (1st Cir. 2020). A court should vacate an arbitration award procured by fraud or undue means where (1) there is "clear and convincing evidence; (2) of fraud that was undiscoverable through the exercise of due diligence at arbitration (3) which materially related to an issue in the arbitration." *Liberty Sec. Corp. v. Fetcho*, 114 F. Supp. 2d 1319, 1321–22 (S.D. Fla. 2000) (citing *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir.1988). Importantly, "[t]his last element does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred." *Bonar*, 835 F.2d at 1383.

In the present case, Petitioner inappropriately withheld relevant and discoverable evidence from the Respondents, which was only discovered when Cathy Pattap disclosed the existence of such evidence in the course of her testimony. The withholding of the "black book" by Petitioner prejudiced Respondents by causing the denial of a subpoena for relevant evidence from non-party Chase Bank. After Respondents sought a subpoena to Chase Bank from the Panel, Petitioner not only continued to withhold the "black book" from production, but also vigorously opposed this subpoena on the grounds that it had "nothing whatsoever to do with the issues in this case." (*See* Cl.'s 3/23/2020 Opp., Fruin Decl. Ex. 28.) Had Respondents known about the "black book" and, in particular, that Petitioner believed ***they*** were responsible for certain questionable spending in

her Chase Bank Account, rather than Alexis Schottenstein, then they would have made that argument to the Panel when seeking documents from Chase. Adding insult to injury, the first time this claim was ever made to Respondents was in the hearing when the Panel allowed Petitioner to testify (based on her "black book") that she believed Respondents were responsible for ongoing theft from her Chase Bank accounts.[21]

Further, Petitioner failed to produce in discovery Pattap's eight-page single spaced statement which was authored on Petitioner's behalf and which outlined in great detail Evan's alleged misconduct as well as over 500 pages of documents reflecting communications between Alexis Schottenstein and Petitioner's counsel. These acts are exactly the type of intentional misconduct worthy of vacatur. *Contra PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*, 187 F.3d 988, 993 (8th Cir. 1999) (finding no undue means where counsel ***inadvertently*** withheld, failed to disclose, or improperly marked privileged documents unlike the present case wherein Petitioner's counsel intentionally withheld evidence).

Finally, Petitioner's reliance for 5 weeks on privileged communications supplied by Cathy Schottenstein Pattap is both unethical and precisely the type of "underhanded or conniving ways of procuring an award" that violates the FAA. *See Hoolahan*, 947 F.3d at 112–13. *See also* Ann. Mod. Rules Prof. Cond. § 8.4(a) ("It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or **do so through the acts of another** . . . .") (emphasis added); *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th Cir. 1992) (defining "undue means" as behavior that is

---

[21]  "[F]raud requires a showing of bad faith during the arbitration proceedings, such as bribery, undisclosed bias of an arbitrator, or **willfully destroying or withholding evidence**." *Morgan Keegan & Co., Inc. v. Garrett*, 495 F. App'x 443, 446-47 (5th Cir. 2012) (emphasis added). Courts have construed "undue means" as requiring intentional misconduct, "equivalent in gravity to corruption or fraud, such as a physical threat to an arbitrator," and connoting "behavior that is immoral if not illegal." *PaineWebber Grp., Inc. v. Zinsmeyer Trust P'ship*, 187 F.3d 988, 991 (8th Cir. 1999) (citations omitted).

"immoral if not illegal" or otherwise in bad faith). Pattap's testimony revealed this was not an isolated incident but, rather, a repeated course of conduct where Pattap played the role of family peacemaker for approximately five weeks, while pumping Evan Schottenstein for privileged information, and furnishing it to Petitioner's legal team. (*See* Tr. pp. 921-927; 932-934:1; 941:23-25; 942:1-7; 944:25; 945-952; 962:18-25; 963; 964:1-19; 965:9-25; 966; 967:1-7, Fruin Decl. Ex. 8.) Accordingly, where Pattap's misbehavior repeatedly benefitted Petitioner, and neither she nor her counsel did anything to stop such behavior, vacatur is warranted.

### III.  THE ARBITRATORS FAILED TO MAKE REQUIRED DISCLOSURES AND OTHERWISE EXHIBITED "EVIDENT PARTIALITY."

Section 10(a)(2) of the FAA permits this Court to vacate an award obtained in an arbitration "where there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). "This rule is meant to be applied stringently. As the Supreme Court emphasized in the seminal case of *Commonwealth Coatings Corp. v. Continental Cas. Co.*, courts 'should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.'" *Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1338 (11th Cir. 2002) (quoting *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 149 (1968)).

#### A.    Arbitrator Solomon Failed to Disclose a Personal Lawsuit Against Evan Schottenstein's Subsequent Employer, State Farm.

Testimony from Cathy Pattap revealed that Respondent Evan Schottenstein interviewed with, and was hired by, State Farm Insurance in or around August 2020. (*See* Tr. 769:6-769:17; 939:16-939:20, Fruin Decl. Ex. 8.) Nevertheless, while this arbitration was pending, Arbitrator Solomon along with her husband commenced a breach of contract dispute against State Farm Insurance, which remained pending for 3 months until it was concluded in May 2020.

Notwithstanding her obligations to do so, Chairperson Solomon failed to notify the parties or update her arbitrator disclosures. (*See* Solomon 11/9/2020 Disclosure Report, Fruin Decl. Ex. 33.) While it is possible that Ms. Solomon held no grudge against State Farm as a result of their denial of her homeowner's claim and her state court lawsuit, it is just as plausible that she ***did*** hold a grudge and that it ***did*** impact her views on Evan Schottenstein. Respondents, however, had no opportunity to probe this potential bias or ask Arbitrator Solomon any questions about this lawsuit because Arbitrator Solomon failed to comply with her obligation and made no disclosure about this lawsuit whatsoever. This is improper.

Arbitrator disclosures are of paramount importance to the FINRA arbitration process. The FINRA Arbitrator Guide explains:

> Arbitrator disclosure is the cornerstone of FINRA arbitration, and the arbitrator's duty to disclose is continuous and imperative. Disclosure includes any relationship, experience and background information that may affect—or even appear to affect—the arbitrator's ability to be impartial and the parties' belief that the arbitrator will be able to render a fair decision. When making disclosures, arbitrators should consider all aspects of their professional and personal lives and disclose all ties between the arbitrator, the parties and the matter in dispute, no matter how remote they may seem. If you need to think about whether a disclosure is appropriate, then it is: **make the disclosure**.

(FINRA Arbitrator's Guide, p. 17, Fruin Decl. Ex. 55.)[22] Furthermore, FINRA's Arbitrator Checklist provides that non-investment related lawsuits are mandatory disclosure items for arbitrators. *See* FINRA Arbitrator Disclosure Checklist at IX.1, Fruin Decl. Ex. 56 ("Have you ever been a party to a non-investment related lawsuit?")

---

[22]   Likewise, Arbitrator Rich failed to comply with these obligations in failing to disclose his prior lawsuit where he sued a landscaping company and its principal. (*See* Rich Docket and Rich 8/28/2020 Disclosure Report, Fruin Decl. Exs. 34 and 35.)

B.      Arbitrator Scutti Was Misclassified as a Public Arbitrator and
        <u>Exhibited Evident Partiality When That Classification Was Challenged.</u>

Under FINRA Rule 12100, an arbitrator may not be classified as a "Public Arbitrator" if

he is, or was, associated with . . . an entity that is organized under or registered pursuant to the

Securities Exchange Act of 1934, Investment Company Act of 1940, or the Investment Advisers

Act of 1940." FINRA Rule 12100 (aa)(1)(C). Moreover, that same rule dictates that an arbitrator

may not be classified as a "Public Arbitrator" where he "was, for a total of 15 years or more, an

attorney . . . who has devoted 20 percent or more of his or her professional time annually to

representing or providing services to parties in disputes concerning investment accounts or

transactions, or employment relationships within the financial industry." FINRA Rule 12100

(aa)(3).

According to his biography Arbitrator Scutti worked for the Securities Exchange

Commission for four years, (*see* Scutti 10/14/2020 Disclosure Report, Fruin Decl. Ex. 57), which

is an entity organized under 15 U.S.C. § 78d, the Securities Exchange Act of 1934. By that

definition alone he should be re-classified as a "Non-Public Arbitrator."[23] Arbitrator Scutti also

practiced primarily securities law for over 22 years and disclosed nearly 40 entities that he had

represented or was adverse to in securities cases. (*See id.*). Arbitrator Scutti's Arbitrator Disclosure

form listed four areas of practice, two of which fall within the mandatory disqualification language

of FINRA Rule 12100(3): "(2) Representations of individuals in investigations and enforcement

matters . . . (3) Securities litigation and arbitrations representing customers, brokers and

occasionally brokerage firms[.]" (*See id.*)

---

[23]  Pursuant to FINRA Rule 12100(t), "The term 'non-public arbitrator' means a person who is otherwise qualified
to serve as an arbitrator, and is disqualified from service as a public arbitrator under paragraph (aa)."

Therefore, by virtue of either his employment by the SEC or his extensive securities law practice, Arbitrator Scutti should not have been classified as a "Public Arbitrator." This difference in classification carries with it very real consequences. Since Donald Ryce, the withdrawing arbitrator, was a "Public Arbitrator," he could only be replaced by another "Public Arbitrator." *See* FINRA Rule 12403(f). Thus, if Arbitrator Scutti had properly been classified, he would have been prohibited from serving on this Panel as a replacement arbitrator.

In addition to being misclassified, Arbitrator Scutti should likewise have been removed for the bias and lack of impartiality he displayed in an improper exchange with a FINRA representative. When FINRA staff contacted him to verify his previous work in the securities industry, Arbitrator Scutti asked the FINRA representative "if the industry party raised the issue" and further asked "**if it was JP Morgan**." (*See* 10/15/2020 FINRA Letter, Fruin Decl. Ex. 17 (emphasis added).)  Arbitrator Scutti should have not asked FINRA staff who questioned his classification. To do so reflected both a serious lapse in judgment and a deeply held bias against the industry, which tainted his ability to fairly and impartially decide the case.[24] These communications established, clearly and convincingly, that J.P. Morgan – and by extension the Respondents as affiliated with J.P. Morgan – had no chance of receiving a fair and impartial hearing with Arbitrator Scutti as a panelist. At a minimum, it is clear his improper behavior undoubtedly established the appearance and perception of bias. *See* FINRA Arbitrator Guide at 14, Fruin Decl. Ex. 55 ("Arbitrators are viewed by parties in an arbitration case much as a judge would be viewed in a court of law. . . . Therefore, it is particularly important in arbitration that the forum **be fair and be perceived to be fair**.") (Emphasis added.)

---

[24]   Furthermore, instead of informing Arbitrator Scutti that his question was inappropriate and would not be answered, the FINRA staff member compounded this bias by telling Arbitrator Scutti that J.P. Morgan was indeed the party that had challenged his qualifications.

C.   <u>Arbitrator Scutti Employed Petitioner's Handwriting Expert In a Previous Case.</u>

Three days before Petitioner's handwriting expert Frank Harley Norwitch was to testify, Arbitrator Scutti revealed to the parties for the first time that he had previously hired Mr. Norwitch as a handwriting expert in one of his own cases. (*See* 10/22/2020 Disclosure from Scutti, Fruin Decl. Ex. 21.). Arbitrator Scutti's previous work with Mr. Norwitch, Petitioner's expert witness, created a reasonable impression of partiality. At a minimum, the fact that Arbitrator Scutti had personally hired Mr. Norwitch necessarily meant that any challenge to Mr. Norwitch's qualifications would not be well-received by Arbitrator Scutti. Because Petitioner had alleged various forgeries, handwriting was a critical issue in the arbitration, and Arbitrator Scutti's predisposition toward Mr. Norwitch's qualifications and credibility was problematic.

Under FINRA Rule 12405 this is precisely the sort of "past financial, business, professional, family, social, or other relationship[]" "which might preclude the arbitrator from rendering an objective and impartial determination in the proceeding[.]" *See* FINRA Rule 12405. Nevertheless, even though Respondents objected to Arbitrator Scutti's continued service in light of this rule, FINRA overruled those objections and ruled that Arbitrator Scutti should, yet again, stay.

Arbitrator Solomon's failure to disclose, Arbitrator Scutti's misclassification, and the facts surrounding Arbitrator Scutti's prior retention of Petitioner's handwriting expert are all facts that reveal evident partiality and require vacatur. Vacatur is proper where there is an actual conflict of interest or where there is a business or other connection that might create a reasonable impression of possible bias that the arbitrator failed to disclose. *Gianelli Money Purchase Plan & Tr. v. ADM Inv'r Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir. 1998). In a case where arbitrators failed to make proper disclosures, a court will vacate the award where the "undisclosed facts create a 'reasonable *impression* of partiality.'" *Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 433 (11th Cir. 1995)

(*quoting Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1201 (11th Cir.1982)) (emphasis added). Importantly, there need only be the reasonable impression of partiality; no actual bias must be proven. *See Lexington Ins. Co. v. Southern Energy Homes, Inc.,* 101 So. 3d 1190, 1205 (Ala. 2012) ("An arbitrator's nondisclosure of facts showing a potential conflict of interest creates evident partiality *warranting vacatur* even when no actual bias is present.") (quoting *Schmitz v. Zilveti,* 20 F.3d 1043, 1045 (9th Cir.1994)).

Indeed, numerous courts have vacated awards for failure by an arbitrator to make required disclosures. *See, e.g.*, *Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1338 (11th Cir. 2002) (award vacated where arbitrator failed to disclose his business relationship with a representative of one of the parties and with counsel to both parties); *Gianelli Money Purchase Plan & Trust v. ADM Investor Services, Inc.,* 146 F.3d 1309, 1310 (11th Cir. 1998) (award vacated where arbitrator failed to disclose that he had served as counsel to the corporate representative of one of the parties to the arbitration); *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1199 (11th Cir. 1982) (award vacated where arbitrator failed to disclose that his family-owned insurance company was in adversarial litigation with one of the parties to the arbitration); *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 436 F.3d 495 (5th Cir. 2006) (vacating arbitration award for "evident partiality" where an arbitrator failed to disclose that he had previously acted as co-counsel with the law firm representing one of the parties); *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 159–60 (8th Cir. 1995) (vacating arbitration award for "evident partiality" where an arbitrator failed to disclose that his law firm had a working relationship with one of the parties); *Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir. 1994) (vacating arbitration award for "evident partiality" where an arbitrator failed to disclose that his law firm had represented the parent company of one of the parties). *See also Crow Constr. v. Jeffrey M. Brown Assoc. Inc.*, 264 F. Supp. 2d 217, 226 (E.D. Pa. 2003) (vacating arbitration award

based on repeated failed disclosures); *Sun Ref. & Mktg. Co. v. Statheros Shipping Corp. of Monrovia, Liberia*, 761 F. Supp. 293, 303 (S.D.N.Y.) (vacating arbitration award where arbitrator had previously been involved in arbitration against a party).

## IV.    THE ARBITRATORS REFUSED TO HEAR VIDEO EVIDENCE INCLUDING PETITIONER SAYING, "I WOULD PUT MORE INTO [COATUE] IF I COULD."

During her cross examination, Respondents attempted to introduce multiple videos of Petitioner that were taken on January 10, 2019, four days after Petitioner authored her January 6, 2019 complaint letter and the day it was received at J.P. Morgan. Petitioner objected, and the Panel sustained Petitioner's objection to the admission of these videos.[25]

The exclusion of this video evidence prejudiced the Schottenstein Respondents. Contrary to Petitioner's allegations that she knew nothing of the $5 million investment in the Coatue Private Equity Fund, in one of the proffered videos made on January 10, 2019, Petitioner remembered the investment and even stated, "I would put more into it if I could." Furthermore, upon being told that there were no losses in her J.P. Morgan account and that it was valued at $90 million, Petitioner stated, "I should have double." The Panel should have heard and considered this evidence giving it the weight it deemed appropriate. To outright exclude it, however, is improper and is adequate grounds for vacatur. *See* FAA § 10 (a)(3) (vacatur is proper "where the arbitrators were guilty of misconduct in . . . refusing to hear evidence pertinent and material to the controversy[.]"); *Johnson v. Directory Assistants Inc.*, 797 F.3d 1294, 1301 (11th Cir. 2015) ("Vacatur is appropriate where the arbitrator refuses to consider evidence 'pertinent and material to the controversy.'"); *Robbins*

---

[25]    Petitioner argued that because she had not consented to being videotaped the videos were inadmissible under Fl. Stat. § 934.03 as intercepted oral communications. Petitioner relied on *State v. Smith*, 641 So. 2d 849, 851 (Fla. 1994) ("The Fourth Amendment right to privacy is measured by a two-part test: 1) the person must have a subjective expectation of privacy; and 2) that expectation must be one that society recognizes as reasonable."). Respondents countered that where, as here, Petitioner sees the cellphone and knows she is being recorded, she does not have a subjective or objective expectation of privacy. *See Smiley v. State*, 279 So.3d 26, 264 (Fla. Dist. Ct. App. 2019) (agreeing with "the trial court's finding that Smiley did not have a subjective expectation of privacy in his statements when he saw the cell phone in the victim's hand and knew that he was being recorded.")

*v. Day*, 954 F.2d 679, 684-685 (11th Cir. 1992) (court willing to consider claim that failure to compel testimony constituted refusal to hear evidence under section 10(a)(3)), overruled on other grounds by *First Options of Chicago v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)).

## V.     THROUGH THEIR REPEATED INATTENTION TO THE PROCEEDINGS THE PANEL WAS GUILTY OF MISBEHAVIOR PREJUDICIAL TO RESPONDENTS.

Unfortunately, the unsuitability of this lengthy and complex case proceeding via Zoom was borne out by the flagrant inattention of the arbitrators. At various times during the five-week proceeding, the three arbitrators ignored the arbitration hearing to sleep, text, talk on their phones, talk with others in their homes, and even leave the camera frame altogether. *See* Arbitrator Misconduct Log, Fruin Decl. Ex. 47. Over the course of 43 hearing sessions, Arbitrator David Rich was not present on camera on approximately 149 separate occasions, totaling nearly 3 hours[26]. *Id.* On one such occasion, he was out of the camera frame for more than 4 minutes. Arbitrator David Rich Off-Camera Video, Fruin Decl. Ex. 48. Arbitrator Rich also appeared to be dozing off or sleeping on 54 occasions. *Id.* At one point during the hearing, he took an almost seven-minute nap. Arbitrator David Rich Sleeping Video, Fruin Decl. Ex. 49. Likewise, Chairperson Donna Solomon appeared to be sleeping for more than 4 minutes on one occasion. Chairperson Donna Solomon Sleeping Video, Fruin Decl. Ex. 50. Additionally, she was off-camera or talking to someone off-camera on 22 distinct occasions. Arbitrator Misconduct Spreadsheet, Fruin Decl. Ex. 47. Arbitrator James Scutti was similarly distracted during the hearing and was texting on his phone for a total of approximately 24 minutes during the hearing.

---

[26]    Respondents acknowledge that Arbitrator Rich suffered from back problems that sometimes required him to stand behind his chair visible in the camera frame. These instances are not included in the total number of occasions on which Arbitrator Rich was off-camera.

*See, e.g.*, Arbitrator Misconduct Spreadsheet, Fruin Decl. Ex. 47, and Arbitrator Scutti Phone Use Video, Fruin Decl. Ex. 51.

Section 10(a)(3) of the FAA, provides for vacatur of an award "where the arbitrators were guilty . . . of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). Much like a judge, one of the paramount responsibilities of an arbitrator is to pay attention to the proceedings before them. Repeatedly sleeping, texting, and wandering off, are not and, should not be, acceptable behavior from FINRA arbitrators. Given that the result of that inattentiveness was an $18 million award against Respondents and J.P. Morgan, the Panel's misbehavior prejudiced Respondents.[27]  *See* FAA § 10(a)(3); *see, e.g.*, *Hott v. Mazzocco*, 916 F. Supp. 510, 517 (D. Md. 1996) ("Misconduct sufficient to warrant vacating an award is something patently egregious, such as an arbitrator sleeping during testimony or having ex parte contacts.").

**VI.   THE PETITION TO CONFIRM THE AWARD SHOULD BE DENIED AND A DECISION ON PETITIONER'S ENTITLEMENT TO ATTORNEYS' FEES SHOULD BE DEFERRED.**

Section 9 of the FAA provides that a court must confirm an award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." FAA, 9 U.S.C. § 9. For the reasons set forth above, the Award should be vacated pursuant to the Federal Arbitration Act. Each of those reasons is also a reason why the Award should not be confirmed.[28] Finally, Respondents believe that the issue of an award of attorneys' fees is premature and should

---

[27]   Not only is the size of the award prejudicial to Respondents, but its logic, or lack thereof, is prejudicial as well. The award appears to rely upon, and at the same time fly in the face of, the legal principles of comparative fault, respondeat superior, and vicarious liability. Likewise, in the case of Avi Schottenstein, it makes him liable for funds never received by him, but by his employer. These inconsistencies and deficiencies are not just examples of prejudice to Respondents, they also reflect the fact that the arbitrators "so imperfectly executed [their powers] that a mutual, final, and definite award upon the subject matter submitted was not made." *See* FAA § 10(a)(4).

[28]   In addition, the Petition to Confirm to should be denied for the independent reasons that it is not properly before this court and is time barred. Pursuant to Section 6 of the FAA and this Court's Order dated March 18, 2021, the Petition was a motion that was denied as moot and was not refiled in the one year provided for in 9 U.S.C. § 9. *See* ECF Nos. 68 and 70. While Respondents recognize that the Court addressed these arguments in its Order on Respondents' Motion [ECF No. 73], nevertheless, they are being re-asserted here to preserve them for appeal, if necessary.

be reserved until this Court rules on Respondents' motion to vacate and Petitioner's petition to confirm.

## **REQUEST FOR HEARING**

Based on the considerable factual record of this motion and the complexity of the legal arguments involved Respondents request a hearing on this motion. Respondents believe one hour in total, with thirty minutes for each side, should be sufficient.

## **CONCLUSION**

For the foregoing reasons Respondents respectfully request that the Petitioner's petition be denied and that the Panel's award be vacated in its entirety.

Dated: March 7, 2022                              MAYNARD, COOPER & GALE, P.C.


                                                 /s/ Peter S. Fruin
                                                 Peter S. Fruin, Esq., FBN. 32897
                                                 Kathryn Roe Eldridge, Esq., FBN. 0105885
                                                 1901 Sixth Avenue North, Ste. 1700
                                                 Birmingham, AL 35203-2618
                                                 Telephone: 205.254.1000
                                                 Fax: 205.254.1999
                                                 Email: pfruin@maynardcooper.com

                                                 *Attorney for Respondents Evan and Avi Schottenstein*


## **CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2022, a copy of the above and foregoing has been filed with the Court via the CM/ECF system, which will serve a copy upon all counsel of record.


                                                 /s/ Peter S. Fruin
                                                 Of Counsel