Page 453

1    accounts from your personal RR number, OPM7 to my new

2    split with Avi, 08D6," right?

3         A     Yeah.

4         Q     You say, "Please see the attached file,"

5    right?

6         A     Uh-huh.   Yes.

7         Q     And if we turn to Page 5, here's the list of

8    accounts, right, and your grandmother is at the top of

9    the list, right?

10        A     And that's the Schottensteins in order, and it

11   grew.  It grew.  There was a $46 million managed account

12   that I think a year later or maybe later this year that

13   we got that was also put into this number.

14             And there were plentiful mortgages that Avi

15   did all the work that flowed into this number that Avi

16   gave me gross, even more than him, even though he did

17   all the work.  So -- and this is, you know, what is

18   this, 2016, two years into JP Morgan.  It takes time to

19   build up.  You don't get all your clients coming over

20   from your firm on day one.  So it was growing.  This HD6

21   number was growing.

22        Q     All right.  Mr. Schottenstein, thank you for

23   that information.  If we go from May 18, 2016 forward,

24   your brother Avi was receiving 20 percent of the

25   commissions and gross concession revenue that you -- or

Electronically signed by Kim Auslander (001-036-524-3563)                    66a77bc4-6dc6-41a9-b0c8-6920b49e46b8

Page 454

1    net concession revenue that you were generating from

2    transactions in your grandmother's account, right?

3        A    At a meager, I believe 80/20, 80 to JP Morgan,

4    20 to my brother.  My brother was getting very, very

5    little.  It was beefed up.

6             I want to say this.  It wasn't always 80/20.

7    I think I changed it later to 50/50.  He was getting a

8    very meager 20 percent.  I was making 40, JP Morgan 60,

9    he was getting 80/20.

10       Q    Weren't these commissions coming to you and

11   then you split them with him on your payout?

12       A    It wasn't just me.  It was -- there were a lot

13   of teams that had arrangements like this.  My brother

14   was doing originations.  He was bringing in new

15   business.  He was focusing on mortgages.  He was very

16   successful with it.  The mortgages --

17       Q    Okay.  Great.  Thanks.  Let's turn to

18   Exhibit 48, Page 1.  Down at the bottom of the page, you

19   see Zach Shelly on November 6, 2018 sending out a blast

20   e-mail about a November 6 meeting for the Coatue Early

21   Stage Fund launch, right?

22       A    Right.

23       Q    Then we see an e-mail from -- another e-mail

24   from Jack Shelly -- Zach Shelly saying, "Please submit

25   your indicative demand by the end of the day today."

Electronically signed by Kim Auslander (001-036-524-3563)                    66a77bc4-6dc6-41a9-b0c8-6920b49e46b8

Page 769

1    before?

2        Q    Between January of '19 when the dispute seemed

3    to come up and this communication in late August, did

4    you have any communications with Evan about the matter?

5        A    No.  Nothing.

6        Q    And can you then tell us what happened in late

7    August?

8        A    Yeah.  Out of the clear blue sky, on Friday,

9    August 28, I got call from Evan.  He said that he --

10   actually, at first I think it was -- it went to

11   voicemail.  In the voicemail he said, "I'm having an

12   interview at State Farm Insurance in Englewood,

13   New Jersey" -- which is just like five to ten minutes

14   away from my house -- "and I know we haven't talked in a

15   long time."  He left -- this was in the message -- "I am

16   embarrassed, but I would like to come over and talk to

17   you."  This and that.

18            So I called him back and he said, "I'm here in

19   Englewood.  Can I come over?"

20            I said I did not think that was a good idea.

21   Then he started talking, and I was having plans with my

22   family to have -- we were going out to dinner, so I

23   couldn't talk long.

24            I said, "All right.  Why don't we pick this up

25   on Sunday," which because I knew he was going to be

Electronically signed by Kim Auslander (001-036-524-3563)        37744da8-ba52-4ca0-a734-a8514b324bda

Page 816

1      Q    So it's your testimony that in January --

2  sometime in early January, Alexis and your grandmother

3  called you asking you for a recommendation, even though

4  you had no connection to the brokerage industry?

5      A    That's right.

6      Q    And you then called someone at Goldman Sachs

7  who recommended their broker, and you then called them

8  back?

9      A    No.  What happened was my friend, Gaurav Seth

10 sent an e-mail to me and Christian, and said,

11 "Christian, I would like you to meet Cathy.  Cathy, I

12 would like you to meet Christian" you know, making an

13 introduction.

14         As soon as I got the e-mail, I forwarded it to

15 Alexis.  I said, "My cousin Alexis is in Florida with my

16 grandmother, and you can talk to her about it."  I was

17 not involved after that.

18     Q    Do you have those e-mails?  You forwarded that

19 e-mail then on to Alexis?

20     A    Yes.  I sent all this to Scott.

21     Q    You sent it to Scott?

22     A    He has the entire e-mail chain.

23     Q    He has the entire e-mail chain.  So you

24 provided this to opposing counsel -- my opposing

25 counsel -- you provided this to your grandmother's

Electronically signed by Kim Auslander (001-036-524-3563)                                37744da8-ba52-4ca0-a734-a8514b324bda

Page 817

1    **counsel, this entire e-mail chain?**

2          A    Yes.  A long time ago.

3          **Q    How long ago?**

4          A    Well, the first -- it was early on when my

5    grandma first retained them.  Then Scott called me more

6    recently, I would say maybe the past month or so ago,

7    and asked if I had anything, and I said, "Well, I have

8    that e-mail."  And then he asked me to re-send it.  I

9    forwarded what I had sent a long time ago.

10         **Q    What other documents did you send to**

11   **Mr. Ilgenfritz?**

12         A    Just -- he wanted me to-- after I was having

13   the calls and the confrontation with Avi and stuff, he

14   asked me to write it down and e-mail it to him.

15              MR. FRUIN:  Madam Chair, to the extent that

16         the witness has produced documents to opposing

17         counsel, we would ask for their immediate

18         production to us so that I can review them this

19         evening and have the ability to cross-examine the

20         witness on these documents.

21              CHAIRPERSON SOLOMON:  Counsel?

22              MR. FRUIN:  Mr. Burns, you are on mute.

23              MR. BURNS:  Thank you.  I would like to check

24         with Mr. Ilgenfritz about that, but there is no

25         obligation for us to have produced those, I don't

Electronically signed by Kim Auslander (001-036-524-3563)                              37744da8-ba52-4ca0-a734-a8514b324bda

Page 855

```
 1      identify the fact that there are additional
 2      documents.  For example, on -- these are Bates
 3      labeled Cathy 1 through Cathy -- through whatever,
 4      but on Cathy 11, it identifies this is not the
 5      first letter Beverley has written.  She has a black
 6      book that she started to talk about these actions.
 7          Then on Cathy 110 -- that by the way is in the
 8      document from -- that was prepared by Cathy in
 9      January of 2019, again, before Mr. Ilgenfritz and
10      Mr. Burns were hired.
11          Then, on 110, she -- Cathy sends an e-mail to
12      Mr. Ilgenfritz where she says, "The black book
13      diary that preceded it, Dawn will be sending you
14      the black book.  She found it in my grandmother's
15      safe at the palace."
16          That was sent to Mr. Ilgenfritz on July 11,
17      2019.
18          So, these are documents that his client
19      created well before there was any issue of
20      litigation, well before Mr. Burns or Mr. Ilgenfritz
21      were identified.  These are documents that should
22      have been produced to us.
23          It identifies that it's in their possession,
24      custody, and control.  We demand the production of
25      these documents.  And to the extent that if they
```

Electronically signed by Kim Auslander (001-036-524-3563)                    8ccc5f0d-9854-4bcd-bd17-caf6021df05e

Page 869

1           CHAIRPERSON SOLOMON:  Okay.  So your request

2      is to take a recess now?

3           MR. FRUIN:  Until 1:00.  Yes, Madam Chair.

4           CHAIRPERSON SOLOMON:  Okay.

5           MR. BURNS:  Madam Chairman, I want to consult

6      with Mr. Ilgenfritz, who's not in the room right

7      this minute, but I don't understand why we can't

8      proceed with Ms. Pattap's cross examination at this

9      point in time, and then we'll address moving to

10     Mr. Alfaro as opposed to Avi Schottenstein, who was

11     going to be the next witness.  We can talk about

12     that with Mr. Ilgenfritz and have a response for

13     you.

14          I don't know, is the Panel -- let me describe

15     what we have from this black book, which is

16     Mrs. Schottenstein apparently wrote four pages and

17     a little bit on the fifth page in a journal, and

18     primarily describes grievances related to

19     apartments in New York and Avi's wedding.

20          In that black book, there were another four

21     pages which were folded that have entries about

22     "Shriners Hospital, cancer for children," just

23     those words, and an item that has, it looks like a

24     budget of some expenses that she had kept that has

25     things like The Plaza, a restaurant, she has her

Electronically signed by Kim Auslander (001-036-524-3563)                8ccc5f0d-9854-4bcd-bd17-caf6021df05e

1       son Chuck's phone number written down.  That's --

2       the black book consists of about nine pages, and I

3       think we will send those on.

4           The item on the text messages that Cathy

5       Pattap had sent to us are already in their

6       possession.  They have the same ones.  They just

7       want to see which ones were included in the ones we

8       sent.  Those can be forthcoming very quickly.

9           Then I think we have some e-mail exchange with

10      Alexis, and we can -- so all of this can be -- if

11      the Panel wants us to produce those, we can produce

12      those certainly before noon.

13          I think we should proceed with Ms. Pattap's

14      cross examination, and I'll talk with

15      Mr. Ilgenfritz about whether he's willing to take

16      up the suggestion of moving Mr. Alfaro to after

17      lunch.

18          Scott has said we can take Mr. Alfaro after

19      lunch, if that's what they would like to do.

20          MR. FRUIN:  If I can quickly respond?

21          CHAIRPERSON SOLOMON:  Sure.

22          MR. FRUIN:  The issue is we have already been

23      prejudiced.  There was significant prejudice to us

24      in the failure to produce the documents to us in a

25      timely manner.  We are trying to do things on the

Electronically signed by Kim Auslander (001-036-524-3563)          8ccc5f0d-9854-4bcd-bd17-caf6021df05e

**account?**

A. No one. It's been --

**Q. No one?**

A. -- with Goldman and my grandmother.

**Q. Okay. So at this time, you don't know, then -- do you know, other than Alexis and other than apparently Evan, do you know anyone else who has regular access and reviews the Bev Schottenstein AOL.com emails?**

A. I didn't even know she had that email, because she doesn't have a computer or -- she wouldn't even know how to turn on a computer.

So, no, I have no knowledge whatsoever of anything with emails regarding my grandmother.

**Q. Now, one of the things I asked you is I said that you sent the -- after you sent the email in January to set up the -- to assist the Goldman Sachs, you know, relationship, right, you started that wheel in process; correct?**

A. My -- when I reached out to my friend Gaurav -- you have the emails.

**Q. Right.**

A. He sent an email. That was the extent of my involvement with that.

**Q. Sure.**

**And I asked you, after sending that email,**

Electronically signed by Nancy Paulsen (501-304-117-2502) d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 904

1    your next dealings with any of this was in June, when

2    you had the meetings with the lawyers in Florida; right?

3            Remember that testimony?

4        A.    Yeah.  You mean like my next -- like, my next

5    -- my personal involvement was when I went to see my

6    grandmother again in June.

7        Q.    But that's actually not true, is it?

8            Weren't you heavily involved in creating an

9    outline of notes of purported securities fraud and

10   financial elder abuse committed by Evan and Avi

11   Schottenstein against Beverley Schottenstein and her

12   estate that was -- and there were multiple revisions of

13   that document created between 1/17 and 1/22 of 2019?

14       A.    Alexis created that document and she asked me

15   if I would help edit, like revise the wording of it

16   because I'm an English teacher.

17           So she sent it to me.  That's actually when

18   she moved into a hotel, because she needed which-if,

19   because she said she wanted to create a document because

20   she was worried that Evan and Avi were committing

21   crimes.

22           And she said that she had a background with

23   some law, because she had just graduated from the London

24   School of Economics, and she wanted to, like, put

25   together a document.  And then she dictated -- she

Electronically signed by Nancy Paulsen (501-304-117-2502)            d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 905

1    started dictating it to me because she didn't have --

2    there was no which-if in my grandmother's apartment.

3              And then -- then you could see the back and

4    forth where she created this document, and then I just

5    helped, like, I don't know, like, clean up the wording.

6        Q.   Well, in it, it references as well, for

7    example, things that -- that you purportedly -- I mean,

8    for example, the comment is in this -- well, it talks

9    about churning and unauthorized trading and tax use.

10       A.   I honestly didn't even know what the word

11   "churning" was until Alexis put it in that document.

12       Q.   Elder abuse, but it also references the fact

13   that, for example, the comment about that Evan bragged

14   to you, you know, earlier on that he could forge her

15   signature.  That's in this document as well; right?

16             So this was a joint document prepared by you

17   and Ms. Alexis Schottenstein?

18       A.   I told Alexis that detail.

19             But no, as you can see in the email

20   correspondence, Alexis produced the vast amount of that

21   document.

22       Q.   All right.  One of the things you talked about

23   was that sort of out of the blue you had communications

24   and sort of rekindled text communications with Avi and

25   Evan, in part because you were looking for pictures for

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 921

1    people were talking about it as well; right?

2         A.   Yeah, he sent those texts.

3         Q.   All right.  Next page.  Next page.

4              And then he just sent you a bunch of the

5    letters back and forth between the lawyers where

6    Mr. Ilgenfritz was telling him not to -- Avi or Evan to

7    have any communication with his client; right?

8         A.   Yeah, he just tended to send, like, a flood of

9    texts and letters and emails sort of all at once, and

10   that's what you're going through.

11        Q.   Okay.  Next page.  And next page.  Next page.

12             All right.  Next page.

13             All right.  Now, again, here is another email

14   from you -- or text from you, I should say.  I say

15   email, I apologize.  Text.

16             But you state "Sorry, I'm trying to set up

17   Daniel's computer for virtual school."  But then you

18   say, "The whole thing with Nanny is a disaster.  Do you

19   have any older pics with you and Nanny and Avi where you

20   are all happy before the lawsuit?  Maybe in Florida or

21   New York?  I just want to give her photographic evidence

22   of more normal days."

23             Right?

24        A.   Yeah, he was calling a lot and I was trying

25   to, you know, be more helpful to him.

Electronically signed by Nancy Paulsen (501-304-117-2502)          d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 922

1       Q.    Um-hum.   Okay.

2             Isn't it true that you were really trying to

3       sort of gain both his and Avi's confidence so that they

4       would potentially share with you information that could

5       be used in this lawsuit?

6       A.    No, that is not true.

7       Q.    Okay.

8       A.    I'm not the one who forced the confidence with

9       them.   They reached out to me.

10            And when I wanted to get the first picture, I

11      was going to a second cousin, David Schottenstein.   And

12      David is the one who told Avi to start sending me the

13      pictures.   That's where the pictures all began in the

14      first place.

15      Q.    And when you reached out to David, you didn't

16      tell David, hey, let's -- you know, maybe Avi has these

17      pictures?

18      A.    No.   I had no idea Avi was even connected with

19      the picture.   David took it upon himself to, like -- he

20      knew that Avi had told him earlier that there was all

21      this conflict in the family.   And David, I think,

22      thought he might be, like, softening things by putting

23      us in contact, especially after the Florida pool

24      incident.

25      Q.    All right.   The next page.

Electronically signed by Nancy Paulsen (501-304-117-2502)                              d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 923

1          All right, he explains that Avi was making

2    very little at his job.  But you tell him about the fact

3    that, "Yeah, because she has this totally negative

4    attitude towards your whole family right now and I

5    think" -- "and I think this could help."

6          Right?  "I think this could help."

7      A.   Yes, they were asking me to help him try to

8    soften my grandmother.

9      Q.   Okay.  And again, in none of these texts do we

10   see him offering; it's you saying I will do it and your

11   saying I think this could help.  Isn't that what you

12   wrote?

13     A.   He was calling me and asking me repeatedly to

14   do this.  You're just looking at the texts.  But this

15   was -- he was reaching out to me, as did his mom, and

16   they did to my father, asking if we could somehow

17   influence our grandmother to drop the lawsuit.  That's

18   what you're referring to.

19     Q.   I can only ask you about written documents

20   that I have.  But there aren't -- do you have tape

21   recordings or notes of these conversations that you had

22   with -- you had with Evan or Avi?

23     A.   No, but there were -- he was calling

24   throughout this month.

25     Q.   And he says, "She's mad about the wedding in

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 924

1    Israel."

2              And then if we go to the next page.

3              You say, "She was definitely mad about that."

4    And then you say, "What about pics with her and Avi and

5    Chana before the wedding?"  Right?

6         A.   Yes.

7         Q.   All right, go to the next page.

8              And you say at the bottom "I really think this

9    step could help if I could speak to her about them."

10   Right?

11        A.   I guess the pictures.  I don't know what I'm

12   referring to there.

13        Q.   Okay.  And then you say, "Because right now

14   just talking is not working because she is also very mad

15   at your mom and says she made you give her the account

16   and mad at your dad because he took the jewelry."

17   Right?

18        A.   Correct.

19        Q.   And then you're saying, "So just you and Avi,

20   more recent info."

21             You want to -- your hope is apparently to send

22   pictures of her and Avi to break the tension?

23        A.   I don't know that that was my hope, but he was

24   asking me to do that, and I was -- you know, I was

25   grateful that he was sending the pictures, so I said I

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

1    would, and I did.

2        Q.    Okay.  And again, in the emails, it all says

3    -- you're saying I think you should do this and I think

4    it would help.

5            Does he ever -- is he -- have you seen any of

6    these texts where he's saying that in the texts?

7        A.    Evan is the one who reached out to me, not the

8    other way around.  We hadn't been speaking the entire

9    time.  So, no, I wasn't taking it upon myself to try to

10   help Evan.  I was -- he was starting to text me, he was

11   sending me these pictures, and this is how it -- this is

12   the textual evidence of that.

13       Q.    And during this same time, you are

14   communicating with her -- with your grandmother's

15   counsel and relaying to him what you were talking --

16   purportedly talking to Mr. Evan Schottenstein about;

17   correct?

18       A.    Only when it became relevant to the case.  I

19   wasn't talking with the counsel about pictures.  I

20   actually sent those pictures to my -- to Dawn's phone,

21   and she did show them to my grandma.

22       Q.    Yes.  But you were -- were you telling

23   Mr. Schottenstein that you were, during this entire

24   period, relaying all of the communications that you were

25   having with him to your grandmother's counsel?

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 926

```
 1        A.    I wasn't relaying all of the communications to

 2   my grandmother's counsel.  I was relaying what was

 3   relevant to the case.

 4        Q.    All right.  And did you relay, for example,

 5   anything about him saying that your grandmother was

 6   upset with regards to Andrew Klinger at KeyBank for

 7   losing money, 100,000 to 500,000, and that Jack Fay

 8   retired, and she was jealous with him, and she was mad

 9   at Robert Franchetti?

10             Did you relay any of that information that was

11   relevant to the case to Mr. Ilgenfritz?

12        A.    I may have.  I don't know any of those people.

13   But Evan was sending this flood of texts.  And if I

14   thought it related to the case, then I sent it to him

15   because he asked me to.

16        Q.    I looked through your notes that you sent to

17   Mr. Ilgenfritz, and I didn't see any of this information

18   being shared.

19             So if you said you were sharing information

20   about the case, I'm curious why you wouldn't share

21   information that Mr. Schottenstein had given to you in

22   writing explaining why your grandmother may have been

23   unhappy with her previous financial advisors.

24        A.    I have no idea.  I don't even know who those

25   people are.  So I can't -- I don't know what to say.  I
```

Electronically signed by Nancy Paulsen (501-304-117-2502)                d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 927

 1    don't know how to answer that question.

 2        Q.    Okay.  Well, then, let's go to the next page.

 3              Oh, I'm sorry, this is -- yeah, this -- I

 4    apologize, I was one off.  We were already -- we were

 5    talking about these.  This is the Nelson at Fifth Third

 6    and Klinger and all the -- Jack Fay.

 7              If we can go to the next one.

 8              Because this is someone you know about.  In

 9    the second text there, it says --

10        A.    I don't -- I don't know anything about those

11    people.

12        Q.    If I may finish my question.

13        A.    Sorry.

14        Q.    In the second text, it says, "And then your

15    dad" -- you know who your dad is, right?  -- "lost in

16    Fannie Mae bankruptcy, Citigroup in recession, GM

17    bankruptcy, Phoenix Preferreds, and she says she's

18    moving the Schwab account."  Right?

19              Did you relay that, that he explained to you

20    the reasoning why the Schwab account was transferred

21    from your father is because he had some significant

22    losses in these securities?

23        A.    I don't know if I sent that or not, but I know

24    that it's a lie, so.

25        Q.    Did your father buy your grandmother Fannie

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 932

1       A.   Correct.

2       Q.   And you had previously acknowledged that when

3    your mother [sic] is isolated, she's prone to being

4    influenced by others; correct?

5            And you were hoping -- or purportedly hoping

6    and claiming to Evan that if you could reach out to her,

7    you could potentially break through whatever influence

8    was being placed on her by others?

9       A.   Yes, he asked me to send the pictures, and I

10   did.

11      Q.   Next page.

12           "Here is a picture from Empire State Building

13   when Nanny changed over the 303 West 66th Street

14   apartment to Avi, and Alexis was a witness."

15           Do you see that, and then the picture?

16      A.   Yes.

17      Q.   And then you respond "Alexis and Nanny claim

18   that they were led to believe that Nanny was signing

19   papers so Avi would start paying the fees and taxes, not

20   turning over the entire property."  Right?

21      A.   Yes, that's what my grandmother said.

22      Q.   Yes.

23           And then he responds "Impossible.  The only

24   reason to go to the Empire State Building is to change

25   over the apartment, change the co-op shares to Avi's

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 933

1    name.  The building only uses one attorney, the

2    building's contracted one.  And Nanny had to go in front

3    of the board to express her consent in person."

4            You see that?

5       A.   Yes.

6       Q.   Now, did you share that information or any of

7    these texts with Mr. Ilgenfritz?

8       A.   I don't know.  I sent him a number of texts.

9    I don't know what I sent him.

10      Q.   Well, I did get a copy of the texts that you

11   sent.  And I'll represent to you that the texts that you

12   sent were extremely limited and really only related to

13   resending the letters with regards to Avi going to visit

14   your grandmother and saying that, you know, that there

15   shouldn't be any contact.

16           So at least in the ones that I was sent back

17   by Mr. Burns just a moment ago, none of these texts were

18   included.

19      A.   Oh, do you --

20      Q.   Go ahead.  I mean, do you think you sent them

21   more texts?  Because I only got about six or seven.

22      A.   No.  Scott had asked me to send anything that

23   I thought was relevant.  And I don't -- I didn't even

24   know that this -- this apartment thing was part of this

25   case.  I don't believe it is.  So that would probably be

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 934

1    a reason why I wouldn't have sent it to Scott.

2        Q.   Well, do you think that maybe the reasoning

3    behind why your grandmother may have moved accounts away

4    from Mr. Nason or Mr. Franchetti, do you think that may

5    have been relevant?

6        A.   Actually probably not, no, because those --

7    that was 15 years ago.  I think the case is about

8    illegal trading and all kinds of things that they did

9    while they had her account, not that.

10            But I -- I can't -- I don't know.

11       Q.   Okay.  And then your response to this is "What

12   did Alexis do during all this?  Was she mad?"  Right?

13       A.   Yes.

14       Q.   And then he responds "She was jealous."

15            And then the next page.

16            And it's just because it's the same email, but

17   -- same text.  "After that, she was nonstop bugging

18   Nanny to buy her a condo.  Nanny would say no, and put

19   the blame on me and then" -- "and then Evan wouldn't let

20   her get me one."

21            And then you respond "That's why Alexis

22   started all this.  She wanted a condo."  Right?

23       A.   Yes.

24       Q.   What are you referring to when you say "That's

25   why Alexis started all this"?

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 939

1     next.

2              Next.

3              And this is, you know, he's talking about his

4     parents that are not happy to live underneath because

5     it's so difficult.

6              And you say, "Yeah, I don't blame them.  It's

7     a very unpleasant and awkward feeling there now, and all

8     Nanny talks about is the lawsuit."  Right?

9         A.   Yes.

10        Q.   Okay, next.

11             All right.  So, now, this has been going on

12    for some time.  I forgot to look back.  But this text

13    screen on this day -- a lot of texts on one day.

14             Well, one sec, I apologize, I should have

15    marked this and I didn't.

16             Okay, so this is Sunday, September 6th.  The

17    last 20 pages have been Sunday, September 6th.  But here

18    on that same day, it doesn't show a new day, he says, "I

19    just took a job at State Farm in Englewood."  Right?

20        A.   Yeah.

21        Q.   And that's right where you live; right?

22        A.   Yes.

23        Q.   Okay.

24        A.   Well, close, yes, but it's the neighboring

25    town.

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 941

1      Q.   Turn the page.

2           "Well, next time you're here, we can meet for

3      lunch outside at one of those kosher restaurants on

4      Palisades.  The Falafel Palace is good and there is a

5      Glatt kosher Greek restaurant Sean likes."

6           And Sean is your husband; right?

7      A.   Yes.

8      Q.   Okay.  Now, in fact, this is when you learn

9      that he -- the whole thing about Englewood and a job

10     near you.  And, in fact, you're not saying I don't want

11     to meet with you; you're actually the one saying I would

12     like to meet with you; right?

13     A.   Yeah, during this month, we were having

14     pleasant conversations.  Which is why I would say he

15     opened up and told me the things that he told me.

16     Q.   Next page.

17          Next page.  Sorry, next.  Next.  Next.  Next.

18     Next.  Next.

19          All right.  And now you say with all these

20     pictures, you say "Perfect.  I'm going to call her and

21     send this to Dawn to show her."  Right?

22     A.   Yes.  And I did.

23     Q.   But you also, during this entire time, again

24     were spending this time communicating with

25     Mr. Ilgenfritz and explaining to him what you thought

Electronically signed by Nancy Paulsen (501-304-117-2502)                d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 942

1    would be helpful for your grandmother's case, and did

2    not report anything that you thought might be helpful to

3    Evan's case; correct?

4         A.   I -- my grandmother knew of all this

5    correspondence, and she asked me to talk to Scott about

6    it.  And when I told him, he said send me whatever you

7    think is relevant.

8         Q.   Okay.  Next page.

9              Next.

10             All right.  Here in December 3rd -- in

11   December, three months later, she tells Chana to not

12   procreate, that "our family is all mentally ill,

13   including your father, and then blaming Chana for

14   stealing her handbag."

15             And again, this is referring back to Alexis

16   and the alleged stolen handbag that she apparently

17   alleged you stole and then Chana stole.

18             And your response is "Are you thinking she was

19   planning it the whole time?"

20        A.   Yeah, he had told me that he thought that

21   Alexis was, like, planning a takedown of him and his

22   brother.  So that's what I was asking.

23        Q.   You're saying -- I mean, you -- based on this,

24   you're sort of wondering did you think she -- okay,

25   we'll move on.

Electronically signed by Nancy Paulsen (501-304-117-2502)                d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 944

```
1              Next page.
2              Oh, I think that's actually -- is that -- I
3     think that's Vietnam.
4              China.  Oh, yeah, China, okay.
5              Next page.
6              Oop, sorry, go back.  Sorry.
7              "She was all over Europe and Asia."  You
8     mentioned that she lived with a guy in Florida and
9     Brooklyn in a condo that Nanny bought.  Right?
10             Next page.
11             And you say at the bottom "She obviously has
12    serious problems.  I think Nanny finally cut her off,
13    but who knows."  Right?
14        A.   Yes.
15        Q.   Next page.
16             Next page.
17             "There is a child services claim that shows a
18    customer service with a card company.  Felt she was
19    exploiting Nanny with all her spending."
20             And your response was "She was."  Right?
21        A.   Yes.
22        Q.   Next page.  Next page.
23             All right.  Oh, actually, go back a page.  No,
24    next page, sorry.  It started, but...
25             All right, so now he starts talking about the
```

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 945

1    lawyer; right?

2            "So I could have gotten someone cheaper, $400

3    an hour instead of 600." To be honest, I don't charge

4    that, but. "That I liked more, but J.P. Morgan wanted

5    us to use their pick. It all depends if we get stuck

6    with the bill at the end, it was worth it or not."

7        A.   Yeah, that's what I testified to yesterday.

8        Q.   Yeah. He told you this by text, though;

9    right? We can see this --

10       A.   No, he said it many times on the phone also.

11       Q.   Uh-huh (affirmative).

12            Then let's look at your response. "True. My

13   dad called Scott and they got in a big fight. And then

14   Scott called me and complained. And I just said we're

15   not involved in this thing. He talks to Nanny all the

16   time, I know that." Right?

17       A.   Yes.

18       Q.   Okay. So you're, again, telling Evan that

19   you're not involved in this; right?

20       A.   At that time, I wasn't involved in it, I was

21   simply -- we were corresponding throughout that month.

22   My grandmother knew it. And Scott had asked me to do

23   this. And that's what I did.

24            And I remember that -- the fight thing, too,

25   if you want me to explain it.

Electronically signed by Nancy Paulsen (501-304-117-2502)          d3deda28-9e71-4b20-9fb7-7d1492df14b7

1      Q.   Scott asked you to do what?

2      A.   Send him any texts that I thought were

3   relevant.

4      Q.   So he knew you were communicating with him and

5   was instructing you to relay all that information to

6   him; right?

7      A.   I mean, he said send whatever you think is

8   relevant.

9      Q.   So -- so -- but Mr. Ilgenfritz was well aware

10  that you were communicating with Evan Schottenstein, and

11  he wanted you to communicate and provide any information

12  that you were gleaning from those communications

13  directly back to him; correct?

14     A.   Yes.

15     Q.   Thank you.

16          And you say you weren't involved.  But again,

17  you would agree that you edited an eight-page or

18  ten-page sort of outline of claims against Evan and Avi

19  that was prepared by Alexis; correct?

20     A.   Yes.  In January, when we -- no one, none of

21  us were talking, and it was a big, big, big, big fight.

22     Q.   And then in June of 2019, when a decision was

23  made to hire Mr. Ilgenfritz, you were the only member of

24  the family who was present in that meeting other than

25  your grandmother, with the exception of your father, who

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

1   was participating by telephone; correct?

2        A.   Yeah, my grandmother asked me to come in and

3   be at the meeting.

4        Q.   Okay.  So you were involved in this throughout

5   the entire thing, were you not?

6             From the beginning, you're the one who got --

7   you're the one who called Goldman Sachs.  You, along

8   with Alexis, helped create, whatever your responsibility

9   was, but you added to a ten-page outline of discussing

10   what claims there could be against this -- Evan and Avi.

11             Yet -- and you're communicating with

12   Mr. Ilgenfritz and he's telling you that any information

13   you gather from your brother -- your cousins, to send to

14   him.  Yet at the same time, you're telling Evan that

15   you're not involved; right?

16        A.   I have never seen the statement of claim.  I

17   have not been involved in my grandmother's lawsuit

18   against her grandsons.

19             I -- I don't know what you're really asking.

20        Q.   You're here voluntarily again; right?

21        A.   Yes.

22        Q.   No one -- you're not subpoenaed.  You chose --

23   you voluntarily showed up; correct?

24        A.   I was asked to show up by my grandmother's

25   lawyers and my grandmother.

Electronically signed by Nancy Paulsen (501-304-117-2502)                d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 948

1      Q.    Yes.

2            Turn the page.

3            "Absolutely.  We will too.  It needs to end."

4    Right?  That's your opinion, it needs to end?

5      A.    He was saying that he was really hoping that

6    they could reach a settlement.  And I said, yeah, it

7    would be nice if we could reach a settlement.

8      Q.    Turn the page.

9            Did you play any role in reaching a

10   settlement?

11     A.    No.

12     Q.    Turn the page.

13           Turn the page.

14           At the bottom, you say, "Thanks.  Any news?"

15           That's referring to the lawsuit, you are

16   trying to get more information out of him with regards

17   to the lawsuit and his communications with his lawyers;

18   correct?

19     A.    I'm not sure.  He was telling me a lot about

20   his dating life and stuff.  Actually, I was ask -- I

21   used to ask a lot about this girl that he was dating.  I

22   was sort of interested in what was happening with that.

23   So I don't know what --

24     Q.    Fair enough.

25           And we can turn the page, and actually the

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 949

1    next couple emails here, he took it as such, he took it

2    as --

3         A.   Yeah.

4         Q.   Well, actually he doesn't.  He says, "Thanks

5    for the reminder."  And then he talks about the fact

6    that he's getting ready for a date; right?

7         A.   Yeah, he was -- he was keeping me in --

8    most -- I don't know.  Most -- at least half of our

9    talks and texts were -- I don't know about texts, but at

10   least half of our talks were about his dates.

11        Q.   Right.  But it says, "Thanks.  Any news?"  But

12   his -- his second text is "Nothing new, other than the

13   first hearing is planned for October 19th."  Right?

14        A.   That was his response.  I don't know what I

15   was referring to.

16        Q.   Next page.  Next page.  Next page.  Next page.

17             And this -- here during this time, you are

18   talking to him about his girlfriend, and he sends you a

19   picture; right?

20        A.   Yeah, he was talking to me a lot about this

21   girl.

22        Q.   Next page.  Next page.  Next page.  Next page.

23   Next page.

24             All right.  Down at the bottom, "Thanks.

25   Exciting.  When does she get back?  Do you still have

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 950

1    that meeting with the lawyer today?"

2         Right?  You're asking him and you're inquiring

3    about his meeting with the lawyer on September 18th?

4    A.    Yeah, he must have told me he was having a

5    meeting with the lawyer.

6    Q.    Next page.

7         And when he told you, allegedly or purportedly

8    told you about things that he may have learned or

9    communicated with his lawyers, you then, again, repeated

10   all that information to Mr. Ilgenfritz; correct?

11   A.    No, not necessarily.  I mean, whatever texts

12   you have were the texts that I sent him.  You said that

13   I haven't been sending all the texts.  I mean, I

14   definitely wouldn't be sending to Scott stuff about his

15   dates or anything.

16   Q.    Oh, I'm not suggesting you sent any texts

17   other than the ones that, frankly, are irrelevant.

18        What I'm saying is is you then go -- you did

19   have additional email communication with Mr. Ilgenfritz

20   where you were relaying every time he met with his

21   lawyers and said anything, you then would then

22   purportedly relay what he allegedly said to

23   Mr. Ilgenfritz; correct?

24   A.    Whatever you have in -- whatever you have is

25   what I relayed.

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 951

1      Q.   And that's in the 243 pages that we received

2   of emails and other communications that you had with

3   Mr. Ilgenfritz over the length of this case; correct?

4      A.   Whatever it is.  I don't know.

5      Q.   Next page.

6           Next page.  Next page.  Next page.  Next page.

7   Next page.  Next page.

8      A.   I believe all of these texts happened in the

9   one month that I said we were communicating.  There was

10  just -- yeah.

11     Q.   Next page.

12          All right.  Bottom of the page.  Again talking

13  about relationships.  But then you again bring up,

14  "Totally understand.  How was the lawyer meeting today?"

15     A.   Yeah.

16     Q.   Right?

17     A.   He was telling me about all the meetings he

18  was having with his lawyers.

19     Q.   And you were asking him, you wanted to know

20  what type of communications he was having with his

21  lawyers; correct?

22     A.   I was just being, like, friendly and asking

23  how his lawyer meeting went because he was communicating

24  with me that month about his whole situation.

25     Q.   And you were also communicating with

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 952

1    Mr. Ilgenfritz about your communications with

2    Mr. Schottenstein; correct?

3        A.   Certain things that he sent me that I thought

4    Scott would want, but it was after Scott asked me to,

5    yeah.

6        Q.   Next page.  Next page.  I think it actually...

7             One other thing I would like to talk to you

8    about -- we can -- we can move off of this, but I'd like

9    to now go to --

10            MR. FRUIN:  If we could, if you could go to

11        Respondent's Exhibit 2, Ben.

12   BY MR. FRUIN:

13       Q.   You're familiar, are you not, that there was

14   a -- a trust set up -- a revocable trust set up on

15   April 5, 2011, where -- and then the majority of your

16   grandmother's assets were deposited into that revocable

17   trust; right?

18       A.   I didn't know about this until the whole case

19   came up.  I never saw this.  But I since have heard

20   about it, yes.

21       Q.   And you're familiar, though, for example, in

22   this -- and you may not have -- you know, whenever you

23   learned about it, you learned about it.  That's -- we'll

24   deal with that maybe at a later time.

25            But if we can go to tab 2, page 28.  Down at

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 962

1          stream, and go to what I hope is text number 114.

2                MR. SCRIMALLI:  Yeah, give me one sec.

3                MS. LASHER:  My apologies, I did not announce

4          the witness, Cathy Pattap.

5                You're up there; right?

6                THE WITNESS:  Yes.

7                MS. LASHER:  Okay.  Sorry.

8                MR. FRUIN:  I saw her.  So that's why I --

9                MS. LASHER:  Yeah, yeah.  Thank you.

10               MR. FRUIN:  And this is -- no worries.

11               This is CSP6, Ben.

12               MR. SCRIMALLI:  It might be one page off

13         because I was sent an updated version.

14               MR. FRUIN:  Okay.  So, yeah, so go back one.

15         Yep.

16               All right.  Thank you.

17    BY MR. FRUIN:

18         Q.   **Ms. Pattap, do you see, again, you are asking**

19    **in the middle of the page, "Is it helpful in the case?**

20    **What does your lawyer say since she mailed all those**

21    **letters, et cetera"; right?**

22         A.   Yeah.

23         Q.   **You're asking -- again, you're asking Evan to**

24    **tell you what his lawyers thought about the case, and**

25    **you were inquiring about that; correct?**

Electronically signed by Nancy Paulsen (501-304-117-2502)                d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 963

1      A.   He called me and told me all -- talked to me

2   about the case.  So I -- I don't -- I'd have to look at

3   the -- you know, the previous email -- the text, like,

4   whatever it says.

5      Q.   Sure, we can look at the previous text.

6           The previous text says, "Do you know she got

7   Lasix" -- and this is referring, I'll represent, to

8   Alexis.  "Do you know she got Lasix surgery on Nana's

9   credit card and never told Nana or her mom she was

10  getting the procedure?  There's just tons of stuff over

11  the years.  It would take too much of your time to go

12  through it all."

13          And then you responded, "Is it helpful in the

14  case?  What does your lawyer say since she mailed all

15  those letters, et cetera?"

16     A.   Yeah.  He was talking about Alexis.  And --

17     Q.   Right.  But --

18     A.   And I was asking if -- if he thought that that

19  was helpful or if it had anything to do with the case.

20     Q.   You're referencing "What does your lawyer say

21  since she mailed all those letters?"

22          You're not asking about the Lasix surgery.

23  You're asking "What does your lawyer say since she,"

24  Alexis, "mailed all those letters?"  Do you see that?

25     A.   Yes.

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 964

1          Q.   So you're inquiring to him as to what his

2     lawyers thought about what was going on in the case;

3     correct?

4          A.   Yes.

5          Q.   Likewise, if you go one more page, and one

6     more page.

7               Yep.

8               You also are asking, "Can there be settlement

9     mid-trial, too?"

10         A.   Yeah.

11         Q.   "Or does it have to be before?  Would be good

12    to know.  This thing is happening really soon.  Have you

13    been happy with your lawyers?"

14         A.   Yes.

15         Q.   Again, you're trying to inquire and find out

16    information about what he's told his lawyers and what he

17    thinks of his lawyers; correct?

18         A.   Evan reached out to me this month to talk

19    primarily about the case.  If you're asking --

20              MR. FRUIN:  Objection.  Objection.

21              Madam Chair, I would ask if the witness will

22         simply answer the question that I ask and -- and

23         only the question I ask.

24              MR. BURNS:  And he was interrupting the

25         witness because he didn't like her answer.  And if

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 965

1        he wants to let her -- ask the question again after

2        she gives him the answer if he doesn't think it's

3        responsive, but he should not be interrupting the

4        witness.

5              CHAIRPERSON SOLOMON:  Okay.  I'm going to ask

6        counsel to please restate your question.

7              MR. FRUIN:  Thank you, Madam Chair.

8   BY MR. FRUIN:

9        Q.   My question, Ms. Pattap, is, is it not true

10  that you are asking throughout this time frame what Evan

11  was telling his lawyers, what his lawyers thought about

12  things, and whether or not he was happy with his

13  lawyers?

14              Were you not doing that during this period of

15  time?  Yes or no?

16        A.   In these particular texts, yes.

17        Q.   All right.  Now -- and, again, if you gleaned

18  information that was -- you thought was helpful, you

19  would then share that information with Mr. Ilgenfritz;

20  correct?

21        A.   Yes.  I shared some information with him.

22        Q.   Now, with regards to the outlying note,

23  securities fraud, and financial elder abuse committed by

24  Evan, Avi, and Bobby Schottenstein against Beverley

25  Schottenstein and her estate, the various drafts

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 966

1    starting on January 17 through January 22nd, 2019,

2    you've represented to this panel that that was a

3    document that was created by Alexis and that you edited

4    it and only edited it because you were an English major;

5    correct?

6         A.   She asked me to edit it because I -- because I

7    am an English teacher, yeah.

8         Q.   So on June 24th, you sent an email to

9    Mr. Ilgenfritz in which you said, "It was very nice to

10   meet you on Friday.  Attached please find notes I wrote

11   a few weeks after the initial discovery of securities

12   fraud committed against my grandmother, Beverley

13   Schottenstein."

14        If, in fact, Alexis wrote these notes and you

15   simply was -- were an English editor, why would you have

16   represented to Mr. Ilgenfritz, in fact, that you wrote

17   the notes?

18        A.   I don't know.  I sent him the entire

19   correspondence, so it is very clear that Alexis is the

20   one who created the document.

21        Q.   In that same email, earlier in the email,

22   there is an email from you to Alexis that says, "Hi,

23   Alexis.  Your changes are good.  I revised slightly, and

24   am attaching the latest doc here.  Please work off this

25   version from now.  Thanks."

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 967

```
 1              Isn't it true, as you represented to
 2    Mr. Ilgenfritz, that you created this document and that,
 3    in fact, Ms. Alexis Schottenstein simply made some
 4    revisions that you thought were good, and you then
 5    modified it to the extent that you felt that those
 6    revisions were helpful?
 7         A.   No, that is not true.
 8              MR. FRUIN:  Thank you, Ms. Pattap.  I
 9         appreciate your time today.
10              And I pass the witness.
11              CHAIRPERSON SOLOMON:  Okay.  Okay, Ms. Gould,
12         do you have any questions?
13              MS. GOULD:  Do not.  Thank you.
14              CHAIRPERSON SOLOMON:  Thank you.
15              Okay.  Any redirect?
16              Mr. Burns?
17              MR. BURNS:  Yes, Madam Chairman.
18                      REDIRECT EXAMINATION
19    BY MR. BURNS:
20         Q.   Did -- did you agree, Ms. Pattap, with the
21    actual assertions and conclusions reached in the memo
22    dated January 22nd that was edited by you?
23         A.   Did I agree with what was in there?
24         Q.   Did you agree with the factual assertions and
25    conclusions contained in that memo?
```

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

Page 976

1          Q.   Ms. Pattap, do you see this is an email dated
2     Monday, June 24th, 2019, that you sent to Mr. Scott
3     Ilgenfritz?
4          A.   Yes.
5          Q.   Subject, "Beverley Schottenstein securities
6     fraud notes"?
7          A.   Yes.
8          Q.   And then there is an attachment, but I'd like
9     you to look to the first line of your -- first two
10    line -- couple lines of your text.
11               "Dear Scott, it was very nice meeting you on
12    Friday.  Attached please find notes I wrote up a few
13    weeks after our initial discovery of securities fraud
14    committed against my grandmother, Beverley
15    Schottenstein."
16         A.   Yes.
17         Q.   You wrote that; correct?
18         A.   I did.
19              MR. FRUIN:  Thank you.  Nothing further.
20              CHAIRPERSON SOLOMON:  Okay, Ms. Gould, do you
21         have anything?
22              MS. GOULD:  I do not.  Thank you.
23              CHAIRPERSON SOLOMON:  Okay.  Okay, thank you
24         very much, Ms. Pattap.  You may be excused.
25              MR. FRUIN:  Madam Chair?

Electronically signed by Nancy Paulsen (501-304-117-2502)                    d3deda28-9e71-4b20-9fb7-7d1492df14b7

1        mischaracterization of the document.  These are not

2        his commissions -- well, I guess, Scott -- I

3        apologize -- as long as we have an understanding

4        that this commission number is not his payout, that

5        his payout was only 20 percent of these numbers or

6        so, I have no objection.

7               MR. ILGENFRITZ:  Okay.  Well, subject to

8        having him testify.

9   BY MR. ILGENFRITZ:

10       **Q    What was your percentage revenue payout on**

11  **revenues for which you got production credit from**

12  **May 2016 forward?**

13       A    So, I believe I was always in the, like,

14  lowest grid, because I never ended up going past, like,

15  the next threshold.

16       **Q    Okay.**

17       A    So I think it was somewhere in the 20s, like

18  maybe -- the highest it would have been, maybe like

19  28 percent or something --

20       **Q    Okay.**

21       A    -- around there, but I just want to make sure

22  I understand the columns.

23              So this first column with the total gross

24  commission, what is that referring to?

25       **Q    It's my understanding that that's total**

Electronically signed by Kim Auslander (001-036-524-3563)                    45db4c03-64cb-4dc2-9d59-23cec705315d

Page 1687

1  let things go.

2      Q.   Okay.  Now, Mrs. Schottenstein, there have

3  been a lot of the telephone records produced in this

4  case.  And the telephone records reflect that you spoke

5  to your grandson Evan very frequently, sometimes many

6  times -- many times a day.

7          Please tell the arbitration panel whether or

8  not those conversations with Evan involved securities

9  that he was talking to you about to purchase or sell in

10  your account at J.P. Morgan Securities.

11     A.   I never had any business discussed with me.

12  The only -- the only times he called was to complain

13  about his girlfriends or -- nothing business.  No

14  business.

15          If I -- if I would call him, he would say,

16  "Don't call me now, I'm on the bus."  Or things like

17  that.  "I can't talk to you, there are people on the bus

18  too."  Or things like that that I couldn't -- and if I'd

19  call him at night, he said, "I was just leaving the

20  house," I mean, "I can't talk to you now."

21          I mean, he always had an excuse that he didn't

22  need any conversation.  I never had much of a

23  conversation with Evan.  Everything conversation was his

24  girlfriends or how mean they are or who they are.

25  Nothing -- nothing great, let's put it that way.  And I

Electronically signed by Nancy Paulsen (501-304-117-2502)          aa7adc1f-a90d-49cc-ba9b-70c2d399d179

Page 2101

1    that I have, I don't know what the hell they did with my

2    money.  I haven't -- I haven't seen any things what

3    they're -- they're making for me, I never saw anything

4    they were doing for me.  Never, never, never.

5             I tell you something, if it happened to you,

6    you would know.  It didn't -- it happened to me, and it

7    was a big secret.

8        Q.   Do you believe that they actually took money

9    out of their -- your account for their own benefit?

10       A.   Yes, I do.  Yes, I do.

11       Q.   And what money do you believe that they took

12   out of your account for their own benefit?

13       A.   Well, how would I know what money they took?

14   They took enough.

15       Q.   How much?

16       A.   Millions.  Now you want to -- they took

17   millions.

18       Q.   They took millions?

19       A.   Yes.

20       Q.   And did they take out -- and did they take

21   those millions out by withdrawing it?

22       A.   How do I know what -- how they did it.

23       Q.   Okay.  But there was millions of money in your

24   account that they physically took out through some type

25   of withdrawal process for their own benefit; is that

Electronically signed by Nancy Paulsen (501-304-117-2502)          f6f07a88-d46a-4fe2-8a41-123c92096c23

Page 2210

1          MS. LASHER:  Okay.  Avi Schottenstein.

2          MR. AVI SCHOTTENSTEIN:  Here.

3          MS. LASHER:  Evan Schottenstein.

4          MR. EVAN SCHOTTENSTEIN:  Here.

5          MS. LASHER:  Ben Scrimalli.

6          MR. SCRIMALLI:  Here.

7          MS. LASHER:  Peter Fruin.

8          MR. FRUIN:  Yes.

9          MS. LASHER:  Beverley Schottenstein.

10         MS. BEVERLEY SCHOTTENSTEIN:  Here.

11         MS. LASHER:  And we have Nancy Paulsen.

12         THE COURT REPORTER:  Here.

13         MS. LASHER:  And we also have Denise --

14         MS. LIDDIARD:  Here.

15         MS. LASHER:  Yes.  I'm trying to get your last

16    name in the tip of my tongue, and I can't.  Denise

17    Liddiard.  There we go.

18         MS. LIDDIARD:  I'm here.  Thank you.

19         MS. LASHER:  Thank you.

20         All right.  Let me get the recording started.

21         RECORDING ANNOUNCEMENT:  This meeting is being

22    recorded.

23         All right, Ms. Solomon, you're good to go.

24         CHAIRPERSON SOLOMON:  Okay.  The motion to

25    exclude the video recording is sustained.

Electronically signed by Nancy Paulsen (501-304-117-2502)                    5b14feb4-e6df-443c-a35e-f4b4571b8dc4

Page 2212

1           And, therefore, what I need to do, as is done

2      in any case, in court or anywhere else, where

3      evidence is excluded, is the party where the

4      evidence is excluded makes an offer of proof and

5      explains what the evidence would have shown and why

6      that evidence was relevant and, therefore, would

7      impact the ultimate decision.

8           So, number one, again, with all due respect to

9      the panel, I believe the decision was wrong, but I

10     believe I am entitled to make an offer of proof to

11     explain for -- and put on the record for the

12     purposes of, God forbid, any motion to vacate the

13     reasons why that evidence is relevant.

14          CHAIRPERSON SOLOMON:  Well, the -- the

15     recording itself is going to be part -- it's not

16     going to be admitted into evidence.

17          But -- but, Lisa, it's going to still be part

18     of the record; right?

19          Lisa?  It's going to be part of the FINRA

20     record?

21          MR. FRUIN:  If we can agree that it's part of

22     the FINRA record, then I don't need to make the

23     offer of proof.  That's a good point, Ms. Solomon.

24          CHAIRPERSON SOLOMON:  Okay.  I believe

25     that's --

Electronically signed by Nancy Paulsen (501-304-117-2502)                    5b14feb4-e6df-443c-a35e-f4b4571b8dc4

Page 2214

1        sorry, strike that.

2              MR. FRUIN:  I understand.  I -- and -- I

3        understand.

4              Point number one, the portal does not accept

5        video.  So it is not -- we were not able to submit

6        it through the portal.  We had to submit it outside

7        of the portal because the portal does not allow

8        video to be included.

9              So, number one, we would have to make sure

10       that that is still part of the record.

11             And, number two, if Mr. Ilgenfritz will --

12       will stipulate that it is part of the record,

13       without being shown to the panel, then I will

14       accept, and we can move forward under those -- with

15       that understanding.

16             MR. ILGENFRITZ:  The Claimant will stipulate

17       that the videos and the transcripts of the videos

18       and the videos with the subtitles are a part of the

19       record, but they are not admitted into evidence.

20             MR. FRUIN:  As long as they're part of the

21       record for purposes of what I can use on appeal.

22       Would we -- can you agree to that, Mr. Ilgenfritz?

23             MR. ILGENFRITZ:  On a motion to vacate, yeah.

24             MR. FRUIN:  Thank you.  All right.  We can

25       move forward.  Thank you, Madam Chair.

Electronically signed by Nancy Paulsen (501-304-117-2502)                    5b14feb4-e6df-443c-a35e-f4b4571b8dc4

1   **that, in fact, Avi's family or Caroline and Bobby didn't**

2   **pay for the wedding themselves?**

3        A.   I have -- the way they acted, everything they

4   said was that they were using my money to go to Israel

5   for his wedding.

6        Q.   And that's what Bobby and Caroline said?

7        A.   Yes.

8        Q.   Okay.  You really want -- and if we go down --

9   **one, two, three, four -- five more lines.  "I wanted to**

10  **be at the wedding."  Right?  You really wanted to go to**

11  **that wedding?**

12       A.   No.  I -- I asked them to have the wedding in

13  Miami.  That's what I did.

14       Q.   **Yes.**

15       A.   I asked them that -- that was -- they were

16  going to have a small wedding.  I asked them to have a

17  wedding at -- and I would go to the wedding.  That was

18  right after I had my accident.

19       Q.   **Yeah.  And that upset you greatly that they**

20  **didn't have the wedding where you were located?**

21       A.   Well, that didn't upset me greatly.  They

22  didn't want me, they didn't want me, that's all.  I

23  never heard from them at the wedding.  And they came

24  back, and that was the end of it.

25            Then they went back to Israel after that.  A

Electronically signed by Nancy Paulsen (501-304-117-2502)            17dcb2d8-d948-48d3-916f-ea046cf4d636